Aidan W. Butler (SBN 208399)
Attorney at Law
3550 Wilshire Boulevard, Suite 1924
Los Angeles, California 90010
Telephone: (213) 388-5168
Telecopier: (213) 388-5178

Attorneys for Plaintiff GEVORK GRIGORYAN

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEVORK GRIGORYAN, an individual,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>EXPERIAN INFORMATION SYSTEMS, etc.,<br><br>　　　　　Defendants. | CASE NO: CV13-07450 MMM (PLAx)<br><br>**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT; SUPPORTING DECLARATION OF AIDAN W. BUTLER**<br><br>**Date: December 15, 2014**<br>**Time: 10:00 am**<br>**Courtroom: 780** |

**COMES NOW** Plaintiff GEVORK GRIGORYAN and submits his Opposition to Motion for Summary Judgment, as follows:

/ / /

/ / /

/ / /

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. BACKGROUND FACTS.

For the sake of brevity, the background facts – recited in the concurrently filed declaration of Plaintiff – will not be repeated here.

## II. THE APPLICABLE STANDARD.

In ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Summary judgment is proper only if the moving party shows that there is no genuine dispute as to any material fact and that such moving party is entitled to judgment as a matter of law. (Fed. R. Civ. Pro. 56.)

The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

## III. ARGUMENT.

### A. STATUTE OF LIMITATIONS.

Defendants cite *Drew v. Equifax Info. Servs., LLC*, 690 F.3d 1100, 1109 (9th Cir. 2012), for the argument that a "two-year limitations period starts to run once the plaintiff either knows or has reason to know of the alleged violation." (Motion, 6:27-7:1.) However, the court in *Drew* pointed out, however, that "an FCRA investigation is tied to the reasonableness of an investigation rather than the accuracy of its results." (Id. at 1110.) The court noted that the plaintiff before it "did not know what information was available to the bank for its investigation," he had "no basis to judge whether the investigation was reasonable." (Id.)

Moreover, the "burden is on the defendant to demonstrate that a reasonably diligent plaintiff would have discovered the facts constituting the violation," and the defendant seeking summary judgment must "demonstrate how a reasonably diligent plaintiff . . . would have discovered the violations."  (Id., citing *Strategic Diversity, Inv. v. Alchemix Corp.*, 666 F.3d. 1197, 1206 (9th Cir. 2012.)

Without question, the statute of limitations would not bar the F.C.R.A. claims relating to the BOA account #2, since the negative reporting relating to that account had to do with a 30-day-late status of Plaintiff's home equity line of credit from September, 2011, and first disputed by Plaintiff toward the end of October, 2011, and not verified by the Defendants until after that.  (See, for instance, Grigoryan Dec., Ex. "R.").

Nor would the statute of limitations bar Plaintiff's claim against TRANS UNION relating to the CMI credit reporting.  As shown in Exhibit "AA" to Plaintiff's declaration, TRANS UNION verified the reporting on May 25, 2012.

### B. DEFENDANTS HAVE NOT SHOWN THE ACCURACY OF THE BOA INFORMATION WHICH THEY REPORTED.

Defendants refer repeatedly to inadmissible evidence – specifically, BOA records – to bolster the claim that the negative credit reporting was in fact accurate.[1] However, Defendants do reconcile this point with the fact that the late reporting was ultimately repudiated by BOA, and eventually corrected by the Defendants themselves.

The records in question were not properly authenticated (F.R.E. 901).  Further, they are apparently offered for the truth of the matters asserted, and are therefore hearsay. (F.R.E. 801, et seq.).

---

[1]   Section III(B)(1) of Defendants' Points and Authorities includes many incomplete references to the Statement of Undisputed Facts.

    Moreover, the records contradict BOA's own letters to Plaintiff from May 23, 2012, and May 30, 2012 – Exhibits "AA" and "BB," respectively; the former communicates that the "[t]he *corrected* information was submitted . . . to the credit reporting agencies" (italics for emphasis), and the latter that Plaintiff's payment was "was never late."  (While Exhibit "BB" refers to "your 10/2011, mortgage installment," this was seemingly a typographical error, or perhaps a different way of characterizing the same thing; the negative credit reporting related to a 9/2011 late payment, and not a 10/2011 late payment.)

    All of the negative credit reporting at issue in this case was patently incorrect; the BOA late payment entries were wrong as a matter of empirical fact, and the TWC entries reported by TRANS UNION reflected an account that never belonged to Plaintiff at all.  The furnishers of information all eventually deleted the negative information, and the Defendants all eventually corrected their reports.

    Further, Plaintiff obtained actual payment receipts from BOA, and submitted those to the Defendants during the dispute process.   (See Plaintiff's Dec., ¶29, Exhibit "P."

    Defendants cite BOA's pleadings in the prior lawsuit brought by Plaintiff as evidence that Plaintiff was in fact late.   The First Amended Answer hardly constitutes evidence; not only was it not verified, it is unsurprising that a litigant should deny the allegations against it rather than suffer a motion for judgment on the pleadings, or the like.

    While Defendants contend that Plaintiff "Plaintiff confirmed the accuracy of his HELOC Account in 2012" (Motion, 10:13-14), this assertion necessitates extreme interpretive liberality.  In fact, Plaintiff agreed to remove a dispute comment.  In his deposition,[2] Plaintiff explained that he submitted a form requesting the removal of a

---

[2] The relevant testimony is at pages 278 - 279:3, pages which are not included in the deposition excerpt filed by Defendants; their excerpt leaps from 267 to 297, omitting the intervening pages.

1. dispute comment from his report on the advice of a refinance company that he was
2. working with.  They had told him that having a dispute comment on his report would
3. make underwriting impossible.   (See Butler Dec., and Exhibit "1" – an excerpt from
4. the deposition of Plaintiff.)

      Defendants argue (for instance, Experian relies upon the Scott Declaration, ¶26), that it would have been inconsistent with Experian's policy to refuse to allow such a change unless the consumer requesting the change "confirmed the accuracy of the current reporting on the tradeline at issue." However, there is no first-hand evidence that any such confirmation was in fact secured in this case, or regarding what any discussion actually consisted of.   Exploiting a consumer's desire to refinance by forcing them to confirm the accuracy of something that the consumer had already disputed hardly demonstrates a meaningful confirmation, but rather a manipulation – especially when the source of the disputed information ultimately confirms the disputing consumer's version of events.   (See Plaintiff's Dec., Exhibits "AA," "BB," etc.)

      While TRANS UNION argues that it "only reported information regarding the BOA Mortgage, BOA HELOC, CBA, Sequoia and CMI accounts as received from the furnishers" (Motion, 11:4-5), such "mere parroting" is inadequate; it is well established that the consumer reporting agencies cannot blindly repeat whatever is communicated to them by their sources; they must maintain reasonable procedures to ensure that the information from their sources is accurate.

### C. WHETHER THE DEFENDANTS UTILIZED REASONABLE PROCEDURES TO ENSURE MAXIMUM POSSIBLE ACCURACY, AND WHETHER PROPER REINVESTIGATIONS WERE CONDUCTED BY THE DEFENDANTS, ARE QUESTIONS OF FACT.

As pointed out by the court in *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, (9th Cir. 1995), "[t]he FCRA was the product of congressional concern

over abuses in the credit reporting industry."  (Citing *St. Paul Guardian Insurance Co. v. Johnson*, 884 F.2d 881, 883 (5th Cir. 1989).)  "The legislative history of the FCRA reveals that it was crafted to protect consumers from the transmission of inaccurate information about them [citing inter alia, *Kates v. Crocker National Bank*, 776 F.2d 1396, 1397 (9th Cir. 1985)]; and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner.  [Citations omitted.]"  Moreover, "[t]hese consumer oriented objectives support a liberal construction of the FCRA."  (Citing *Kates,* 776 F.2d at 1397.)

The FCRA requires that "[w]henever a consumer reporting agency prepares a consumer report  it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."  15 U.S.C. § 1681e(b).  In order to make out a prima facie violation under § 1681e(b), a consumer must present evidence tending to show that a credit reporting agency prepared a report containing inaccurate information.

"The reasonableness of the procedures and whether the agency followed them will be jury questions in the overwhelming majority of cases."  *Guimond v. Trans Union Credit Info. Co. Supra*, 45 F.3d at 1333.

In this case, Plaintiff has demonstrated that he was not late in making the payments on the BOA accounts.  Not only did BOA later correct the negative information it initially provided the Defendants, in relation to second BOA account, Plaintiff obtained letters from the bank itself confirming this.  Exhibit "AA" communicates that the "[t]he *corrected* information was submitted . . . to the credit reporting agencies" (italics for emphasis), and Exhibit "BB" conveyed that Plaintiff's payment was "was never late."  Moreover, Plaintiff mailed the Defendants actual payment receipts obtained from BOA showing that he had made the payments for the month in question (September, 2011), as well as the preceding and following months.

Moreover, the TWC account reported by TRANS UNION did not belong to

1  Plaintiff; TRANS UNION deleted an entry pertaining to that account from one debt
2  collector, only to allow to resurface when it was reported to TRANS UNION by a
3  second collector – and subsequently verified the debt after Plaintiff's dispute.
4  (Plaintiff's Dec., ¶¶47, et seq.)

"Generally, a plaintiff need not point to specific deficiencies in an agency's practices or procedures." *Nelski v. Trans Union, LLC*, 86 Fed. Appx. 840, 845 (6th Cir. Mich. 2004), citing *Morris v. Credit Bureau of Cincinnati, Inc.*, 563 F. Supp. 962, 968 (S.D. Ohio 1983) on the point that "it is not plaintiff's burden to suggest ways in which defendant might improve its operation."

Nevertheless, specific deficiencies are quite apparent in this case.  While witnesses for the Defendants testify in some detail about the investigation process, not one of them testifies that any of their investigators actually reached out to Plaintiff to seek more information from him, or additional supporting documents. Similarly, none testifies that they demanded more detailed information – such as supporting documents – from BOA, their furnisher.   The Defendants' own testimony suggests, in fact, that the Defendants, confronted with directly contradictory – and wholly irreconcilable – assertions made by the consumer and their furnisher/subscriber, simply sided with the latter.   In essence, no bona fide investigation was conducted at all; the Defendants simply asked the furnisher to verify, and then accepted the verification on faith.  This hardly amounts to an investigation at all; it is simply a reflexive decision that the furnisher – the bank – was right, and the consumer was wrong.

This situation is reminiscent of the testimony facing the court in *Saindon v. Equifax Info. Servs.*, 608 F. Supp. 2d 1212, 1217 (N.D. Cal. 2009):

> "In its motion and declarations, [Equifax] does lay out a string of application procedures that include both automated and manual checks by the agency. But giving all reasonable inferences to the plaintiff, the monitoring and reinvestigation procedures could be seen as quite limited. The procedures could

Case 2:13-cv-07450-MMM-PLA   Document 73   Filed 11/17/14   Page 8 of 11   Page ID #:1030

be seen by a jury as merely basic automated checks that catch missing data fields on submitted forms, which do not go to the heart of whether a source of information is trustworthy. For example, when a consumer files a complaint contesting the accuracy of an item on his or her credit report, the sole action taken by Equifax is to contact the source of the information to verify if it is accurate. If the source says that it is, the inquiry ends [Citation to record]. This does virtually nothing to determine the actual credibility of the source -- which is what plaintiff asserts is lacking -- or so a jury could reasonable conclude."

When dealing with the second account – that is, the 3-day-late blemish relating to Plaintiff's HELOC – none of the Defendants' suggests that any consideration was given to the fact that BOA had already misreported information about Plaintiff once before, and eventually corrected itself.

Further, none of the Defendants' witnesses testifies that Plaintiff's actual dispute letters were transmitted to BOA, the furnisher; instead, coded summaries were prepared and transmitted electronically.  This is especially troublesome with regard to the dispute relating to the second account, in connection with which Plaintiff submitted payment receipts generated by BOA itself.

## IV. PLAINTIFF HAS SUFFERED COMPENSABLE DAMAGES.

Defendants argue that business damages are not compensable, but this is inaccurate.   For example, the court in *Dennis v. BEH-1, LLC*, 520 F.3d 1066, 1069 (9th cir. 2008) found that the denial of credit for a consumer to start a business was in part grounds for actual damages under the FCRA.  See also *Gorman v. Wolpoff & Abramson, L.L.P.*, 584 F.3d 1147, 1174 (9th Cir. 2009), in which the court rejected the notion that there were insufficient damages because consumer who had hoped to start a business was denied credit.

Indeed, the plain language of the statute allows a consumer to recover "any actual damages sustained by the consumer as a result of the failure,"   Clearly

CV13-07450 MMM (PLAx)                                    8                        OPPOSITION TO M.S.J.

Congress could have expressly limited damages to non-business losses.   (15 U.S.C. 1681n(a)(1)(A).)

Moreover , apart from economic damages, it is well-established that "emotional distress can give rise to actual damages under the FCRA, whether or not a plaintiff actually is denied credit as a result of the FCRA violation." (*Valentine v. First Advantage*, 2009 U.S. Dist. LEXIS 110153, 10 (C.D. Cal. 2009), citing *Dennis v. BEH-1, LLC*, supra, 520 F.3d at 1069.

## V. A REASONABLE JURY COULD FIND THAT THE DEFENDANTS ACTED WILLFULLY.

A willful violation includes both knowing violations and actions in "reckless disregard of a requirement" of the FCRA.   See *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 56-58, 71, 127 S. Ct. 2201, 167 L. Ed. 2d 1045 (2007). An action is deemed reckless if it entails "an unjustifiably high risk of harm that is either known or so obvious that it should be known."   (Id. at 68.) As a result, "a company subject to [the] FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless."

In any case, "[w]illfulness under the FCRA is generally a question of fact for the jury." *Edwards v. Toys 'R' Us*, 527 F. Supp. 2d 1197, 1210 (C.D. Cal. 2007.)

In this case, a jury could reasonably conclude that Defendants acted recklessly.

///

///

///

## VI. CONCLUSION.

For all of the foregoing reasons, plaintiff GEVORK GRIGORYAN respectfully requests that the Court deny Defendants' Motion for Summary Judgment in its entirety.

DATED: November 17, 2014　　　Respectfully submitted,

By: */S/ Aidan W. Butler*
Aidan W. Butler
Attorneys for Plaintiff
GEVORK GRIGORYAN

# DECLARATION OF AIDAN W. BUTLER

I, Aidan W. Butler, declare and state:

1) I am an attorney at law, duly licensed to practice before all of the Courts of the State of California, and an counsel for Plaintiff in this case.   I have personal knowledge of all of the following facts, and if called upon as a witness, I could and would testify as to their veracity.

2) Attached hereto as Exhibit "1" is a true and correcy copy of several pages from the deposition of my client, Plaintiff GEVORK GRIGORYAN, specifically, deposition pages 278-279.

3) Attached hereto as Exhibit "2" is a true and correcy copy of several pages from the deposition of my client, Plaintiff GEVORK GRIGORYAN, specifically, deposition pages 197-203, dealing with emotional distress damages.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed November 17, 2014, in Los Angeles, California.


                                          /S/ Aidan W. Butler
                                          Aidan W. Butler