1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| GEVORK GRIGORYAN, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC., an Ohio corporation; EQUIFAX INFORMATION SERVICES, LLC, a Georgia limited liability company; and TRANS UNION, LLC, a Delaware limited liability company,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | NO. CV 13-07450 MMM (PLAx)<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

On October 8, 2013, Gevork Grigoryan filed this action against Experian Information Solutions, Inc. ("Experian"), Equifax Information Services, LLC ("Equifax"), and Trans Union, LLC ("Trans Union") (collectively, "defendants"), alleging violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.*, and the California Consumer Credit Reporting Agencies Act ("CCRAA"), California Civil Code § 1785.1, *et seq.*[1]

[1]Complaint, Docket No. 1 (Oct. 8, 2014).

1    On November 7, 2014, defendants filed a motion for summary judgment.[2]  Grigoryan opposes the

2    motion.[3]

3

4                        **I.  FACTUAL AND PROCEDURAL BACKGROUND**

5         **A.      Factual Background**

6              The facts are, for the most part, undisputed.[4]  Experian, Equifax, and Trans Union are each

7    "consumer reporting agencies" as defined by the FCRA and "consumer credit reporting

8

9

10

11

12

13

14

15

16

17

18

19

20    _____

21         [2]Motion for Summary Judgment ("Motion"), Docket No. 69 (Nov. 7, 2014).  See also
      Reply in Support of Motion for Summary Judgment ("Reply"), Docket No. 76 (Nov. 24, 2014).

22
           [3]Opposition to Motion for Summary Judgment ("Opposition"), Docket No. 73 (Nov. 17,
23    2014).

24         [4]Defendants filed a statement of uncontroverted facts setting forth 216 purportedly
      uncontroverted facts.  (See Defendants' Separate Statement of Uncontroverted Facts ("SUF"),
25    Docket No. 70-1 (Nov. 7, 2014).)  Grigoryan filed a statement of genuine disputes contesting only
      six of defendants' facts.  (See Statement of Genuine Dispute ("SGI"), Docket No. 75 (Nov. 17,
26    2014).)  The facts Grigoryan disputes are those numbered 12, 201, 205, 206, 207, and 208 in
      defendants' statement of uncontroverted facts.  (Id. at 1.)  The court does not rely on these facts.
27    Accordingly, all citations to defendants' statement of uncontroverted facts are to undisputed facts.

28

1  agencies" as defined by the CCRAA.[5]  The parties' dispute concerns five credit accounts or trade

2  lines that Grigoryan contends appeared inaccurately on credit reports compiled by defendants.[6]

3  The creditor on two of the accounts was Bank of America ("BOA").[7]  The first account

4  was a mortgage on a rental property Grigoryan owned for the benefit of his real estate business;

5  the second was a home equity line of credit ("HELOC") secured by the same rental property as

6  the mortgage account.[8]  These accounts appeared on credit reports compiled by each defendant

7  as delinquent.[9]  Three other collection accounts appeared only on Grigoryan's Trans Union credit

8  report: a Collection Bureau of America account (the "CBA account"), a Sequoia Financial

9  Services account (the "Sequoia account"), and a Credit Management Inc. account (the "CMI

10  account").[10]  The CBA and CMI accounts both concern a debt Grigoryan purportedly owed Time

---

14  [5]SUF, ¶ 1.  The FCRA defines a "consumer reporting agency" as "any person which, for
15  monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part
   in the practice of assembling or evaluating consumer credit information or other information on
16  consumers for the purpose of furnishing consumer reports to third parties, and which uses any
   means or facility of interstate commerce for the purpose of preparing or furnishing consumer
17  reports."  15 U.S.C. § 1681a(f).  Similarly, the CCRAA defines a "consumer credit reporting
18  agency" as "any person who, for monetary fees, dues, or on a cooperative nonprofit basis,
   regularly engages in whole or in part in the business of assembling or evaluating consumer credit
19  information or other information on consumers for the purpose of furnishing consumer credit
   reports to third parties, but does not include any governmental agency whose records are
20  maintained primarily for traffic safety, law enforcement, or licensing purposes."  Cal. Civ. Code
21  § 1785.3.

22  [6]SUF, ¶ 52.

23  [7]SUF, ¶ 53.

24
25  [8]Id., ¶¶ 54-55.  The mortgage account number ends in 4658, while the HELOC account
   ends in 4666.  Both begin with the same five digits.  (SUF, ¶ 66.)  For uniformity and clarity, the
26  court refers to the accounts simply as the BOA mortgage and BOA HELOC.

27  [9]Id., ¶ 53.

28  [10]Id., ¶ 57.

3

1   Warner Cable.[11]  The Sequoia account involved a debt originally owed to the Department of Water
2   and Power.[12]

3                    **1.      Grigoryan's Reporting Disputes with Experian**

4          On May 6, 2010, Experian received a letter from Grigoryan dated May 3, 2010, disputing
5   the reporting of his BOA mortgage account.[13]  Grigoryan asserted that BOA had incorrectly
6   reported late payments on the mortgage loan for the four months from December 2009 to March
7   2010.[14]  He stated that BOA had agreed to correct the information, but indicated the adjustment
8   could take up to ninety days.[15]  Because he could not "tolerate another three months of inaccurate
9   reporting," Grigoryan asked Experian to correct the reporting as soon as possible.[16]  As proof of
10  his statements, Grigoryan enclosed two letters he had received from BOA.  The first, dated April
11  20, 2010, stated that Grigoryan's "request for a credit adjustment related to [his] 12/2009,
12  01/2010, 02/2010, [and] 03/2010, mortgage installments for the [BOA mortgage]" had been
13  received, and that "corrected information [had been] submitted [the same day] to the credit
14  reporting agencies."[17]  The letter did not contain any additional information concerning the nature
15  of the "corrected information," and advised Grigoryan that it takes an average of sixty days for
16  credit reporting agencies to make an adjustment.[18]  The second letter from BOA that Grigoryan
17  forwarded to Experian also concerned the BOA mortgage.  It stated that his "request for a credit

18  _____

19  [11]Declaration of Gevork Grigoryan ("Grigoryan Decl."), Docket No. 74 (Nov. 17, 2014),
20  ¶ 21 (CBA account), ¶ 47 (CMI account).

21      [12]*Id.*, ¶ 34.

22      [13]SUF, ¶ 59.

23  [14]Declaration of Sabrina Fernandes ("Fernandes Decl."), Docket No. 69-2 (Nov. 7, 2014),
24  Exh. 1 ("May 3, 2010 Letter and Attachments") at 1.

25      [15]*Id.*, ¶ 60; May 3, 2010 Letter and Attachments") at 1.

26      [16]May 3, 2010 Letter and Attachments") at 1.

27      [17]*Id.* at 2.

28      [18]*Id.*

                                                       4

1    correction ha[d] been approved . . . [and that BOA] ha[d] submitted a formal request to [each

2    defendant]."[19]   The letter advised that the adjustment process could "take 60 to 90 days for

3    completion."[20]  Like the first letter, the second contained no details concerning the nature of the

4    inaccuracy.[21]

5          Experian personnel reviewed the May 3, 2010 letter, its attachments, and Grigoryan's

6    credit report, and determined that it was reporting the BOA mortgage account in good standing

7    and not delinquent.[22]  In response to Grigoryan's letter, it sent him a consumer disclosure on May

8    11, 2010, stating that the account had been reported as in good standing and was not shown as

9    delinquent.[23]  The letter enclosed a copy of an Experian credit report dated May 11, 2010, which

10   listed a number of "BAC Home Loans/Countywide" trade lines; all were reported "Paid" and

11   "Never late."[24]   Experian received no further disputes from Grigoryan concerning the BOA

12   mortgage trade line.[25]

13         On November 4, 2011, Experian received an April 4, 2011 letter from Grigoryan disputing

14   the reporting of a BOA account.[26]  The letter identified the account only by its first five digits,

15   followed by four X's.  Grigoryan asserted that he had obtained a credit report on October 25,

16   _____

17         [19]*Id.* at 3.

18         [20]*Id.*

19         [21]*Id.*

20         [22]SUF, ¶ 61; Declaration of Jason Scott ("Scott Decl."), Docket No. 71 (Nov. 7, 2014),

21   ¶ 14 ("Experian personnel reviewed the May 3, 2010 letter, its attachments and Plaintiff's credit

22   file and determined that the [BOA mortgage account] was reporting in good standing and not
     delinquent").

23         [23]SUF, ¶ 62; Scott Decl., ¶ 15.

24
          [24]Fernandes Decl., Exh. 2 (May 11, 2010 Letter to Grigoryan) at 3-5.
25

26         [25]SUF, ¶ 63.

27         [26]SUF, ¶ 64; Fernandes Decl., Exh. 3 ("April 4, 2011 Letter to Experian") at 1.  The date
     of the letter is clearly erroneous, given that it references a credit report obtained on October 25,
28   2011.  The court nonetheless refers to the letter by its purported date for the sake of clarity.

2011, that contained inaccurate, incomplete, or misleading information in that it stated the account was "past due 30 days" and had a past due amount of $12.[27] He demanded that Experian "immediately delete the above-referenced information from [his] credit report in full, or at least revise the entry to reflect [that] no debt presently exist[ed]"; he also requested reinvestigation of the matter.[28]

In response to the letter, Experian reviewed Grigoryan's credit file and found that his BOA HELOC account was in negative standing and being reported "30[ ] day[s] late."[29] Experian sent an automated consumer dispute verification ("ACDV") to BOA regarding the account, which asked for verification of the account status and payment history.[30] BOA verified the accuracy of

---

[27]April 4, 2011 Letter to Experian at 1.

[28]*Id.* Reinvestigations are governed by 15 U.S.C. §§ 1681i and 1785.16. Section 1681i(1)(A) states: "[I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly, or indirectly through a reseller, of such dispute, the [CRA] shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file in accordance with paragraph (5), before the end of the 30–day period beginning on the date on which the agency receives the notice of the dispute from the consumer or reseller." 15 U.S.C. § 1681i(1)(A).

Section 1785.16(a) provides: "If the completeness or accuracy of any item of information contained in his or her file is disputed by a consumer, and the dispute is conveyed directly to the consumer credit reporting agency by the consumer or user on behalf of the consumer, the consumer credit reporting agency shall within a reasonable period of time and without charge, reinvestigate and record the current status of the disputed information before the end of the 30-business-day period beginning on the date the agency receives notice of the dispute from the consumer or user, unless the consumer credit reporting agency has reasonable grounds to believe and determines that the dispute by the consumer is frivolous or irrelevant, including by reason of a failure of the consumer to provide sufficient information, as requested by the consumer credit reporting agency, to investigate the dispute." CAL. CIV. CODE § 1785.16(a).

[29]SUF, ¶ 68; Scott Decl., ¶ 19.

[30]SUF, ¶ 69; Scott Decl., ¶ 18.

6

the reported information; Experian then sent Grigoryan a consumer disclosure dated November 14, 2014, indicating that BOA had verified that the 30-day late notation was accurate.[31]

Experian then received a letter from Renatus Credit ("Renatus") dated December 15, 2011, which was purportedly sent on Grigoryan's behalf.[32]  The letter stated that Grigoryan's HELOC account was being inaccurately reported, and sought information concerning Experian's policies and procedures for ensuring accurate credit reporting.[33]  The address listed on the envelope did not correspond to any address on file for Grigoryan; thus, Experian requested proof of Grigoryan's current address for security purposes.[34]  No proof of address was provided.  Instead, Renatus sent another letter dated January 10, 2012, stating that Experian had an obligation to respond to its method of verification request, and that it faced FCRA liability for failure to comply.[35]  The letter threatened legal action, but gave Experian an additional fourteen days to respond.[36]  Experian reviewed the letter, found it duplicative of the December 15, 2011 request, and took no further action in light of the outstanding request for verification of address.[37]

On April 30, 2012, Grigoryan contacted Experian via telephone and asked that the consumer dispute comment be removed from his BOA HELOC.[38]  Experian advised him that the dispute comment could only be removed if he confirmed the accuracy of the account information.  He did so, and Experian removed the comment from the account and sent Grigoryan confirmation

---

[31]SUF, ¶ 70; Scott Decl., ¶¶ 19-20; Fernandes Decl., Exh. 4 (November 14, 2011 Consumer Disclosure re: BOA HELOC).

[32]SUF, ¶ 72.

[33]Fernandes Decl., Exh. 5 (December 15, 2011 Letter from Renatus) at 1-2.

[34]SUF, ¶¶ 73-74.  See also Fernandes Decl., Exh. 6 (December 29, 2011 Request for Verification of Address by Experian) at 1.

[35]SUF, ¶ 75.

[36]Fernandes Decl., Exh. 7 (January 10, 2012 Letter from Renatus) at 1.

[37]SUF, ¶ 76; Scott Decl., ¶ 25.

[38]SUF, ¶ 77.

that it had done so.[39]  On June 6, 2012, Experian received a four-page fax requesting that the BOA HELOC account be updated to current and that the consumer dispute comment be deleted.[40]  The request included documentation from BOA showing that payments on the HELOC were "never late" and that "corrected information was submitted on 5/30/2012 to the credit reporting agencies."[41]  There is no evidence in the record as to whether BOA began to re-report the account as disputed after it removed the comment on April 30, 2012.  Based on Grigoryan's request and the accompanying information, Experian updated the BOA HELOC account to current, never late, and no longer disputed.[42]

## 2.      Grigoryan's Reporting Disputes with Equifax

Grigoryan first contacted Equifax regarding his BOA mortgage on May 3, 2010, when he faxed a letter stating that BOA had reported erroneous late payments for the period from December 2009 to 2010.[43]  As he did with Experian, Grigoryan included two letters he had received from BOA that indicated his request for a "credit report adjustment" had been approved.[44]  Equifax prepared and sent an ACDV to BOA regarding the mortgage account.  In the FCRA section of the ACDV, Equifax noted it received documentation indicating that BOA had completed an adjustment concerning the allegedly late payments.[45]  BOA instructed Equifax to

---

[39]*Id.*, ¶ 78; Scott Decl., ¶ 26.

[40]SUF, ¶ 79; Fernandes Decl., Exh. 9 ("June 4, 2012 Experian Express Request") at 1.

[41]June 4, 2012 Experian Express Request at 3.

[42]SUF, ¶ 80; Scott Decl., ¶ 27.

[43]SUF, ¶¶ 86-87.

[44]*Id.*, ¶ 88.  See also Declaration of Vicki Banks ("Banks Decl."), Docket No. 69-6 (Nov. 7, 2014), Exh. 1 (May 3, 2010 Letter to Equifax) at 1-3.

[45]Banks Decl., Exh. 2 (Equifax ACDV dated May 4, 2010) at 1.

1   delete the late payment history from Grigoryan's credit file,[46] and Equifax did so.[47]  The results

2   of the reinvestigation were sent to Grigoryan on May 5, 2014.[48]

3          On October 30, 2011, Equifax received a letter from Grigoryan in which he disputed

4   another BOA account.  This letter, like a similar letter to Experian, was erroneously dated April

5   4, 2011; it also failed to identify the BOA HELOC account as the one being questioned.[49]  Equifax

6   determined that the BOA HELOC was reporting past due, and sent an ACDV to BOA regarding

7   the account.[50]  BOA verified the accuracy of the information.[51]  As a result, Equifax made no

8   changes to the account, which was reported past-due with a balance of $12.[52]  Equifax mailed the

9   results of the reinvestigation to Grigoryan on November 7, 2011.[53]  Prior to December 18, 2011,

10  BOA updated the HELOC account so that it no longer reported a past-due status or any balance.[54]

11  No consumer reports regarding Grigoryan were issued by Equifax to any third party between

12  October 30 and December 18, 2011.[55]

13         On December 18, 2011, Equifax received a letter from Renatus dated December 15, 2011;

14  the letter is identical to the one received by Experian.[56]  Because it was unclear which BOA

15  _____

16  [46]SUF, ¶ 92; Banks Decl., ¶ 42.

17  [47]SUF, ¶ 93.

18  [48]*Id.*, ¶ 94.

19  [49]SUF, ¶¶ 95-98; Banks Decl., Exh. 3 (April 4, 2011 Letter to Equifax) at 1.

20
21  [50]SUF, ¶¶ 99-101; Banks Decl. Exh. 4 ("Equifax ACDV dated November 2, 2011") at 1.

22  [51]SUF, ¶ 102; Equifax ACDV dated November 2, 2011 at 1.

23  [52]SUF, ¶ 103; Banks Decl., ¶ 53.

24  [53]SUF, ¶ 104; Banks Decl., ¶ 54.

25  [54]SUF, ¶ 105; Banks Decl., ¶ 55.

26  [55]SUF, ¶ 106; Banks Decl., ¶ 56.

27  [56]SUF, ¶ 108; Banks Decl., Exh. 5 ("December 15, 2011 Letter from Renatus to Equifax")

28                                                                              (continued…)

1  account was at issue, Equifax sent ACDVs requesting verification of all information on both BOA

2  accounts.[57]  BOA confirmed the accuracy of the information, indicating that both accounts were

3  current with no late payments.[58]

4      Grigoryan next contacted Equifax by telephone on April 30, 2012.[59]  At this time,

5  Grigoryan's BOA accounts both reported a "compliance code condition" stating "account

6  information disputed by consumer."[60]  Equifax sent ACDVs to BOA regarding both of the BOA

7  accounts; in the FCRA field, Equifax noted that Grigoryan "state[d] that he is no longer disputing

8  the account and wanted this to be remove[d]."[61]  BOA responded by removing the compliance

9  condition code on the BOA mortgage, but verified the accuracy of the reporting of the BOA

10 HELOC account.[62]  Equifax sent Grigoryan the results of the reinvestigation on May 2, 2012.[63]

11     On June 4, 2012, Equifax received a "Rapid Resolve" request concerning the BOA

12 HELOC account,[64] in which Grigoryan requested that the compliance code condition be removed.

13 On June 5, 2012, Equifax removed the compliance condition code per the Rapid Resolve request.[65]

14 Thereafter, Grigoryan telephoned Equifax, again disputing the accuracy of the reporting of the

---

[56](...continued)
at 1-2.

[57]SUF, ¶ 112; Banks Decl., Exh. 6 ("December 20, 2011 Equifax ACDVs") at 1-2.

[58]SUF, ¶¶ 113-14; December 20, 2011 Equifax ACDVs at 1-2.

[59]SUF, ¶ 116; Banks Decl., ¶ 66.

[60]SUF, ¶ 117; Banks Decl., ¶ 67.  Compliance condition codes are used by information furnishers such as BOA to provide comments about accounts.  (Banks Decl., ¶ 68.)

[61]Banks Decl., Exh. 7 (April 30, 2012 Equifax ACDVs) at 1-2.

[62]*Id.*  See also SUF, ¶ 121; Banks Decl., ¶ 71.

[63]SUF, ¶ 122; Banks Decl., ¶ 72.

[64]SUF, ¶ 123; Banks Decl., ¶ 73.

[65]SUF, ¶ 125; Banks Decl., ¶ 75.

10

BOA HELOC account.[66]  At the time of the call, BOA was reporting the account as thirty days past due in September 2011.[67]  Equifax sent an ACDV to BOA regarding the HELOC, and stated in the FCRA field that Grigoryan indicated he was not late with the September 2011 payment.[68]  BOA updated the account information and removed the late payment.[69]  Equifax made the requested changes on July 25, 2012.[70]  Grigoryan has not disputed the accuracy of Equifax's reporting of either BOA account since July 25, 2012.[71]

### 3.    Grigoryan's Reporting Disputes with Trans Union

#### a.    The BOA Accounts

On May 5, 2010, Trans Union received correspondence from Grigoryan dated May 3, 2010, which disputed the accuracy of the BOA mortgage trade line, and enclosed the same letters he had sent to Experian and Equifax concerning credit reporting adjustments by BOA.[72]  On May 6, 2010, Trans Union sent an ACDV to BOA using codes A9 and C7, which indicated that Grigoryan disputed the payment history and claimed that BOA had said it would change the information.[73]  On May 10, 2010, BOA responded to the ACDV and directed Trans Union to

---

[66]SUF, ¶ 126; Banks Decl., ¶ 76.

[67]SUF, ¶ 127; Banks Decl., ¶ 77.

[68]Banks Decl., Exh. 8 (July 23, 2012 Equifax ACDV) at 1.

[69]*Id.*  See also Banks Decl., ¶ 79.

[70]SUF, ¶ 130; Banks Decl., ¶ 80.

[71]SUF, ¶ 131; Banks Decl., ¶ 81.

[72]SUF, ¶ 132; Declaration of Steven Reger ("Reger Decl."), Docket No. 69-4 (Nov. 7, 2014), Exh. 1 (May 3, 2010 Letter to Trans Union) at 1-3.

[73]SUF, ¶¶ 133-34; Reger Decl., ¶¶ 17-18.

delete the negative payment information; Trans Union did so, and mailed the results to Grigoryan on May 12, 2010, ending the reinvestigation.[74]

On October 31, 2011, Trans Union received correspondence from Grigoryan disputing the reporting of the BOA HELOC as past due with a $12 balance.[75]  On November 4, 2011, Trans Union initiated a reinvestigation; it sent an ACDV to BOA using dispute code A9, which indicated that Grigoryan disputed the account status and payment information.[76]  On November 7, 2011, BOA verified that the account was correctly reported; Trans Union made no changes and mailed the results of the reinvestigation to Grigoryan the same day.[77]

On December 19, 2011, Trans Union received a letter from Renatus; the letter included a document that purported to be a limited power of attorney.[78]  Trans Union responded on December 21, 2011, advising that it would need a power of attorney that specifically identified Grigoryan; the limited power of attorney that Renatus had enclosed with its letter did not do so.[79] Renatus sent further correspondence, but never provided a power of attorney.[80]  On April 30, 2012, Trans Union received a telephone call from Grigoryan disputing the accuracy of a remark

---

[74]FAC ¶ 73; Reger Decl., ¶ 18-19.  An identical process ensued with respect to an identical correspondence received the same day.  (See SUF, ¶¶ 137-140.)

[75]SUF, ¶ 142; Reger Decl., Exh. 9 (April 4, 2011 Letter to Trans Union) at 1.  This is the same erroneously dated letter sent to Equifax and Experian.

[76]SUF, ¶ 143; Reger Decl., Exh. 10 (Trans Union ACDV dated November 4, 2011) at 1-3.

[77]SUF, ¶ 144-45; Reger Decl., ¶¶ 27-28.

[78]SUF, ¶ 148; Reger Decl., ¶ 31.

[79]SUF, ¶ 149; Reger Decl., ¶ 32.

[80]SUF, ¶¶ 150-151; Reger Decl., ¶¶ 33-34.

code on his BOA HELOC account, which reported that he disputed the account information.[81] Trans Union initiated an investigation and removed the consumer dispute code the same day.[82]

On June 4, 2012, Trans Union received a "Quick Check" from Informative Research regarding Grigoryan's BOA HELOC; enclosed was a signed statement by Grigoryan, which indicated that he no longer disputed any reporting related to the account.[83]  As noted, the record is unclear as to whether BOA had begun re-reporting the disputed status after it was removed on April 30, 2012.  After initiating a reinvestigation on June 6, 2012, Trans Union updated the BOA HELOC account on June 15, 2012 so that it no longer reflected a dispute.[84]

### b.    The CBA, Sequoia, and CMI Accounts

On June 28, 2011, Trans Union received a call from Grigoryan disputing that the CBA account was his.[85]  Trans Union immediately initiated a reinvestigation using the ACDV process to confirm the accuracy of the information.[86]  It used dispute code A2, which indicated to the furnisher of the credit information that Grigoryan disputed the account was his.  The same day, the CBA account was deleted because CBA could not verify it.[87]

On November 21, 2011, Trans Union received a call from Grigoryan in which he disputed that the Sequoia account was his.[88]  TransUnion initiated a reinvestigation using the ACDV

---

[81]SUF, ¶ 152; Reger Decl., ¶ 35.

[82]Reger Decl., ¶ 35.

[83]SUF, ¶ 158; Reger Decl., Exh. 27 (June 4, 2012 Quick Check Request).

[84]SUF, ¶¶ 159, 162; Reger Decl., ¶¶ 42, 45.

[85]SUF, 141; Reger Decl., ¶ 24.

[86]Reger Decl., ¶ 24.

[87]*Id.*, ¶ 24.

[88]SUF, ¶ 146; Reger Decl., ¶ 29.

procedure and dispute code A2.[89]  On December 19, 2011, Trans Union deleted the Sequoia account because it had received no response from Sequoia.[90]

On May 7, 2012, Trans Union received a telephone call from Grigoryan disputing that the CMI account was his.[91]  Trans Union initiated reinvestigation and send an ACDV using code A3, which indicates that the account belongs to another individual.[92]  On May 9, 2012, Trans Union received written correspondence from Grigoryan indicating that he had no knowledge of the CMI account; Trans Union was already investigating the account based on the May 7, 2012 telephone call, however.[93]  On May 23, 2012, CMI verified that the account was accurately reported; Trans Union left the account unchanged and mailed the results of the reinvestigation to Grigoryan on May 25, 2012.[94]

On June 1, 2012, Trans Union received a telephone call from Grigoryan in which he again disputed that the CMI account was his.[95]  Because Trans Union had verified the accuracy of the account on May 23, 2012, it did not initiate another investigation.[96]  On June 7, 2012, Grigoryan called Trans Union again, advising that he would send a fax regarding the CMI account.[97]  At this point, Trans Union initiated a reinvestigation process.  On June 14, 2012, Trans Union received a fax from Grigoryan providing his social security number and a "TU Report #," and attaching

---

[89]SUF, ¶ 146; Reger Decl., ¶ 29.

[90]SUF, ¶ 147; Reger Decl., ¶ 30.

[91]SUF, ¶ 153; Reger Decl., ¶ 36.

[92]Reger Decl., ¶ 36.

[93]SUF, ¶ 154; Reger Decl., ¶ 37.

[94]SUF, ¶¶ 155-56; Reger Decl., ¶ 38-39.

[95]SUF, ¶ 157; Reger Decl., ¶ 40.

[96]Reger Decl., ¶ 40.

[97]SUF, ¶ 160; Reger Decl., ¶ 43.

a copy of his driver's license, and a copy of a June 11, 2012 letter he had received from CMI.[98] On June 25, 2012, CMI once again confirmed the accuracy of the report; because CMI did not verify Grigoryan's social security number, however, Trans Union deleted the account.[99]  On June 28, 2012, Trans Union sent the results of the reinvestigation to Grigoryan.[100]

## B.   Procedural Posture

This is the second time Grigoryan has challenged the reporting of his BOA accounts.  On February 15, 2012, he filed an action against BOA.[101]  On June 7, 2012, he filed a first amended complaint in that case.[102]  The first amended complaint alleged claims for (1) violation of Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601, *et seq*.; (2) violation of the FCRA; (3) violations of CCRAA; (4) violation of California's Unfair Competition Law ("UCL"), California Business & Professions Code § 17200; and (5) defamation and credit slander.[103]  On June 29, 2012, BOA filed a motion to dismiss the first amended complaint,[104] which the court granted in part and denied in part on August 27, 2012.  The court dismissed the third, fourth, and fifth claims as preempted by the FCRA.[105] It denied BOA's motion to dismiss the first and second

---

[98]SUF, ¶ 161; Reger Decl., Exh. 28 (June 14, 2012 Fax to Trans Union).

[99]SUF, ¶ 163; Reger Decl., ¶ 46.

[100]SUF, ¶ 164; Reger Decl., ¶ 47.

[101]Complaint, Case No. 12-01219 MMM (PLAx), Docket No. 4 (Feb. 15, 2012) at 1.

[102]First Amended Complaint ("FAC"), Case No. 12-01219 MMM (PLAx), Docket No. 14 (June 7, 2012)  at 1.

[103]*Id*. ¶ 1.

[104]Motion to Dismiss, Case No. 12-01219 MMM (PLAx), Docket No. 21 (June 29, 2012).

[105]Order Granting in Part and Denying in Part Defendant's Motion to Dismiss, Case No. 12-01219 MMM (PLAx), Docket No. 39 (Dec. 31, 2012).

1  causes of action, however.[106]   On February 18, 2013, the parties reached a settlement, and the

2  action was dismissed on February 27, 2013.[107]

3          Grigoryan filed this action against defendants on October 8, 2013.[108]  The case was initially

4  assigned to Judge Christina Snyder.  After Grigoryan filed a notice of related cases on January

5  3, 2014, the court accepted a transfer of the action from Judge Snyder under General Order 08-

6  05.[109]  On November 7, 2014, defendants filed a motion for summary judgment.[110]  Grigoryan

7  opposed the motion on November 17, 2014.

8

9                                        **II.  DISCUSSION**

10    **A.      Legal Standard Governing Motions for Summary Judgment**

11         A motion for summary judgment must be granted when "the pleadings, depositions,

12  answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

13  there is no genuine issue as to any material fact and that the moving party is entitled to a judgment

14  as a matter of law."  FED.R.CIV.PROC. 56(c).  A party seeking summary judgment bears the

15  initial burden of informing the court of the basis for its motion and identifying those portions of

16  the pleadings and discovery responses that demonstrate the absence of a genuine issue of material

17  fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the moving party will have

18  the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no

19  reasonable trier of fact could find other than for the moving party.  On an issue as to which the

20  nonmoving party will have the burden of proof, however, the movant can prevail merely by

21

22         [106]Notice of Settlement, Case No. 12-01219 MMM (PLAx), Docket No. 49 (Feb. 25,

23  2013).

24         [107]Order Dismissing Civil Action, Case No. 12-01219 MMM (PLAx), Docket No. 50 (Feb.

25  27, 2013).

26         [108]Complaint at 1.

27         [109]Order Regarding Transfer Pursuant to General Order 08-05, Docket No. 42 (Jan. 9,

28  2014).

         [110]Motion at 1.

pointing out that there is an absence of evidence to support the nonmoving party's case.  See *id*. If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed.R.Civ.Proc. 56(e). Conclusory, speculative testimony in affidavits or moving papers is insufficient to meet this burden, or raise genuine issues of fact defeating summary judgment.  See *Nelson v. Pima Community College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) ("mere allegation and speculation do not create a factual dispute for purposes of summary judgment"); *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

In judging the evidence presented in support of or opposition to summary judgment, the court does not make credibility determinations or weigh conflicting evidence.  Rather, it draws all inferences in the light most favorable to the nonmoving party.  See *T.W. Electric Service, Inc. v. Pacific Electric Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987).  Nonetheless, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.  See *Falls Riverway Realty, Inc. v. Niagara Falls*, 754 F.2d 49, 56 (2d Cir. 1985); *Thornhill*, 594 F.2d at738.

## B.    Whether Grigoryan's Claims are Barred by the Statute of Limitations

Defendants first contend that certain of Grigoryan's claims are barred by the statute of limitations.  Section 1681p(1) of the FCRA "sets the statute of limitations at '2 years after the date of discovery [or constructive discovery] by the plaintiff of the violation that is the basis for such liability.'"  *Drew v. Equifax Info. Servs., LLC*, 690 F.3d 1100, 1109 (9th Cir. 2012) (citing15 U.S.C. § 1681p; *Merck & Co., Inc. v. Reynolds,* 559 U.S. 633, 653 (2010) (constructive discovery is generally read into discovery statutes) (alterations original)).[111]  Section 1681p also

---

[111]The statute of limitations was amended on December 4, 2003, with the amendment effective March 31, 2004.  See P.L. 108-159 § 156; *Sweitzer v. Am. Express Centurion Bank*, 554 F.Supp.2d 788, 795 (S.D. Ohio 2008) (observing same).  The prior FCRA statute of limitations required that actions be commenced "within two years from the date on which the liability arises." See 15 U.S.C. § 1681p (1998); *Williams v. Colonial Bank*, 826 F.Supp.415, 418 (M.D. Ala. 1993) (citing the previous statute).  The Supreme Court held that the prior version of § 1681p did
(continued…)

provides a statute of repose, stating that all claims arising from the alleged violation must be brought within "5 years after the date on which the violation that is the basis for such liability occurs." 15 U.S.C. § 1681p(2).  The CCRAA provides a similar limitations period.  It states that an action must be brought "within two years from the date the plaintiff knew . . . or should have known of[ ] the violation of this title, but not more than seven years from the earliest date on which liability could have arisen, except that where a defendant has materially and willfully misrepresented any information required under this chapter to be disclosed to a consumer, . . . the action may be brought at any time within two years after the discovery by the consumer of the misrepresentation." CAL. CIV. CODE § 1785.33.[112]  Despite the different statutes of repose provided, and the CCRAA provision concerning willful concealment, the statutes are treated "the same" by courts.  See *Natale v. TRW, Inc.*, No. CV 97-3661 CRB, 1999 WL 179678, *2 (N.D. Cal. Mar. 30, 1999) ("The statute of limitations for the CCRAA is the same [as for the FCRA]"); see also *Banga v. Equifax Info. Servs., LLC*, 473 Fed. Appx. 712, 713 (9th Cir. May 24, 2012) (Unpub. Disp.) ("The district court properly granted summary judgment [on the FCRA and CCRAA claims] on statute of limitations grounds because Banga failed to file her action within two years of when she knew or should have known that defendant disclosed her credit report to third parties for promotional or other improper purposes"); *Olson v. Six Rivers Nat'l Bank*, 111 Cal.App.4th 1, 12 (2003) (holding that because the CCRAA "is substantially based on the Federal Fair Credit Reporting Act, judicial interpretation of the federal provisions is persuasive authority and entitled to substantial weight when interpreting the California provisions").

"[T]he ultimate burden is on the defendant to demonstrate that a reasonably diligent plaintiff would have *discovered* the facts constituting the violation. . . .  [Defendants must]

---

[111](…continued)

not incorporate a discovery rule.  See *TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001) ("We conclude that the text and structure of § 1681p evince Congress' intent to preclude judicial implication of a discovery rule").  The amendment explicitly recognizes that the statute begins to run on discovery.

[112]Although the statute expressly provides for application of the discovery rule in situations of willful misrepresentation, Grigoryan does not contend, and has adduced no facts suggesting, that defendants wilfully misrepresented any information necessary to bring his CCRAA claims.

1   demonstrate how a reasonably diligent plaintiff . . . would have discovered the violations." *Drew*,

2   690 F.3d at 1110 (quoting *Strategic Diversity, Inc. v. Alchemix Corp.*, 666 F.3d 1197, 1206 (9th

3   Cir. 2012)).   Thus, "[s]ummary judgment [must be denied] if [defendants] fail[ ] to meet this

4   burden and material issues of fact remain as to 'whether [Grigoryan] knew or had reason to know

5   of the specific' violation."   *Id.* (quoting *Norman–Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d

6   1260, 1266 (9th Cir. 1998)).

7        Grigoryan filed this action on October 8, 2013; defendants contend that any § 1681e(b) and

8   § 1785.14(b) claims concerning reports issued prior to October 8, 2011, and any § 1681i claims

9   involving reinvestigation requests that should have been answered prior to October 8, 2011, are

10   barred.[113]   The court agrees.[114]   Grigoryan contends the BOA mortgage was inaccurately reported

11   on his February 2010 and July 22, 2010 credit reports.[115]   Because the reports in question were

12   issued in February and July 2010, and Grigoryan does not assert that the alleged inaccuracies ever

13   reappeared, any claim concerning them is barred by the statute of limitations.   The claims arose,

14   at the latest, on July 22, 2010, when Grigoryan admits he discovered the violations by requesting

15   and reviewing the credit reports.[116]   He may thus not assert claims against defendants for violation

16

17        [113]Motion at 4-8.

18        [114]Grigoryan effectively concedes that his claims arising out of the BOA mortgage and CBA
19   accounts are time barred.   Most certainly, he does not argue otherwise.   (See Opposition at 3
     (arguing only that "the statute of limitations would not bar the [FCRA] claims relating to the BOA
20   [HELOC] . . . . Nor would the statute of limitations bar [Grigoryan's] claim against TRANS
21   UNION relating to the CMI credit reporting.").

22        [115]Grigoryan Decl., ¶ 3 ("In or around February 2010, . . . I found inaccurate and unjust
     delinquency claims on my BOA [mortgage]."), ¶13 ("In or around July 22, 2010, I obtained
23   copies of my credit reports."   My Experian credit report revealed that the inaccurate late payment
     reporting of December 2009 and January 2010, as well as those for the months of February and
24   March 2010, had finally been removed from my credit history.   The report, however, also
25   revealed that a new inaccurate late payment reporting for the month of June 2010 had been
     reported on [my] BOA [mortgage].").
26

27        [116]Grigoryan Decl., ¶ 3 ("In or around February 2010, through review of my credit reports
     maintained by Defendants, I found inaccurate information"); *id.*, ¶ 13 ("In or around July 22,
28   2010, I obtained updated copies of my credit reports.   My EXPERIAN credit report revealed that
     (continued...)

of § 1681e(b) and § 1785.14(b) based on alleged credit reporting inaccuracies concerning the BOA mortgage on his February and July 22, 2010 credit report.

The same is true of claims based on defendants' reinvestigation of the alleged BOA mortgage inaccuracies under § 1681i and § 1785.16.  There is no dispute that Grigoryan sent reinvestigation requests to each defendant on May 3, 2010, and that the requests contained documents from BOA that Grigoryan contended (as he contends now) demonstrated that the reporting was inaccurate.[117]  While it is unclear when the letters were received, the Ninth Circuit applies a rebuttable presumption that mail sent within the contiguous United States arrives at its intended destination within three days.  See *Dandino, Inc. v. U.S. Dep't of Transp.*, 729 F.3d 917, 921 (9th Cir. 2013) ("The United States Postal Service's regulations state that first class mail sent within the contiguous United States will arrive within three days.  We and other circuits have relied on this assumption in our case law"); *Mendez v. Knowles,* 556 F.3d 757, 765 (9th Cir. 2009) ("[T]he Postal Service advises its customers that first-class mail takes one to three days for delivery"); *Lindemood v. Comm'r of Internal Revenue,* 566 F.2d 646, 647 (9th Cir. 1977) ("[T]he normal delivery time for first-class mail sent from San Francisco to Washington, D.C., is three days").  The court therefore presumes that the letters were received on May 6, 2010 – three days after having been mailed.  Defendants responded by forwarding the results of their investigations to Grigoryan on May 11, 2010 (Experian),[118] May 12 and 14, 2010 (Trans Union),[119] and May 5, 2010 (Equifax).[120]  Accordingly, based on the three day delivery presumption, Grigoryan had the facts necessary to discover the alleged violations, i.e., failure to conduct a reasonable

---

[116](…continued)
the inaccurate late payments. . .").

[117]Grigoryan Decl., ¶ 11.  See also *id.*, Exh. G (May 3, 2010 Letters).  Grigoryan also asserts he "contacted" defendants in February 2010.  It is not clear whether defendants dispute this; however, any claim based on this contact is time-barred for the same reasons.

[118]Fernandes Decl., Exh. 2 (May 11, 2010 Consumer Disclosure).

[119]Reger Decl., ¶¶ 19, 23.

[120]Banks Decl., ¶ 44.

reinvestigation, on May 8, 14, 15, and 17, 2010.  See *Drew*, 690 F.3d at 1111 ("As Drew noted, by 2005, Drew had provided FIA with relevant information [concerning the purported inaccuracy] himself; since he knew that FIA had this information, he also knew by that time that incorrect results could only be attributable to an unreasonable investigation").  Because he did not file this action on or before May 17, 2012 – the latest possible date on which he could have filed – Grigoryan's § 1681i and § 1785.16 claims relating to reinvestigation of the BOA mortgage are barred.

Grigoryan's claims concerning the CBA account are also time-barred.  Grigoryan discovered the CBA account on a June 2011 credit report generated by Trans Union[121]  Thus, his § 1681e(b) and § 1785.14(b) claims accrued sometime in June when the credit report was issued. Because Grigoryan does not provide a specific date, the court will assume the report was issued on June 28, 2011, the day he notified Trans Union he disputed the account.  Because Grigoryan discovered the violation by reviewing the credit report, and because he did not file this action by June 28, 2013, two years later, his § 1681e(b) and § 1785.14(b) claims premised on the CBA account are time-barred.  Grigoryan's § 1681i and § 1785.16 claims are likewise time-barred. Trans Union forwarded the results of its allegedly unreasonable reinvestigation to Grigoryan on June 28, 2011.[122]  Assuming he received the results within three days, he had the facts necessary to discover the violation on July 1, 2011.  Because he did not file suit on or before July 1, 2013, his § 1681i and § 1785.16 claims pertaining to the CBA are also time-barred.

For these reasons, the court grants summary judgment in favor of defendants on Grigoryan's § 1681e(b), § 1785.14(b), § 1681i, and § 1785.16 claims insofar as they are premised on inaccurate reporting and unreasonable reinvestigation of his BOA mortgage and the CBA account.  The parties do not dispute that the remaining claims – the BOA HELOC, Sequoia account, and CMI account – involve allegedly inaccurate reporting and reinvestigation that

---

[121]Grigoryan Decl., ¶ 21.

[122]Reger Decl., ¶ 24.

occurred after October 8, 2011.  These claims are timely, therefore, and the court addresses them on the merits below.

    **C.**    **Whether Triable Issues of Fact Preclude the Entry of Summary Judgment in Defendants' Favor on Grigoryan's § 1681e(b) and § 1785.14(b) Claims**

    **1.**    **Whether Grigoryan Has Identified Any Credit Report Inaccuracies**

    Defendants contend that Grigoryan has failed to identify any inaccuracies in his credit reports, and hence that his § 1681e(b) and §1785.14(b) claims fail as a matter of law.[123]  These statutes require that consumer reporting agencies adopt and follow "reasonable procedures to assure "maximum possible accuracy" in consumer credit reports.  Section 1681e(b) states:

> "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."  15 U.S.C. § 1681e(b).

Section 1785.14(b) states:

> "Whenever a consumer credit reporting agency prepares a consumer credit report, it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates. . . ."  CAL. CIV. CODE § 1785.14(b).

    "Liability under § 1681e(b) [and §1785.14(b)] is predicated on the reasonableness of the credit reporting agency's procedures in obtaining credit information. . . .  In order to make out a prima facie violation under § 1681e(b), a consumer must present evidence tending to show that a credit reporting agency prepared a report containing inaccurate information."  *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995); *Banga v. Experian Info. Solutions, Inc.*, No. CV 09-04867 SBA, 2013 WL 5539690, *10 (N.D. Cal. Sept. 30, 2013) ("To the extent Plaintiff's second claim for relief can be construed as alleging a violation of § 1681e(b) and/or § 1785.14(b), Plaintiff has failed to cite evidence establishing that Experian prepared a credit report containing inaccurate information about her in violation of the FCRA or CCRAA"); *Cisneros v.*

---

[123]Motion at 8-11.

*U.D. Registry, Inc.*, 39 Cal.App.4th 548, 570 (1995) (suggesting that § 1785.14(b) and § 1681e(b) are identical, and stating that, "[a]s a disseminator of consumer credit files, UDR had an obligation to 'follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates' [under§ 1785.14(b)]. . . . The same is true under [§ 1681e(b) of the] FCRA"); see also *Dennis v. BEH 1, LLC*, 520 F.3d 1066, 1069 (9th Cir. 2008) ("The district court erred insofar as it held that Dennis couldn't make the prima facie showing of inaccurate reporting required by section[ ] 1681e"); *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1156 (11th Cir. 1991) ("If he fails to satisfy this initial burden, the consumer, as a matter of law, has not established a violation of [§ 1681e(b)], and a court need not inquire further as to the reasonableness of the procedures adopted by the credit reporting agency"). Thus, to establish a prima facie violation of § 1681e(b) and § 1785.14(b), Grigoryan must prove that at least one consumer credit report or file contained inaccurate or misleading information.

The Ninth Circuit held in *Carvalho* that "an item on a credit report can be 'incomplete or inaccurate' within the meaning of the FCRA's furnisher investigation provision, [either] 'because it is patently incorrect, or because it is misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions.'" 629 F.3d at 890 (citing *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1163 (9th Cir. 2009)). Courts have applied the "patently incorrect or materially misleading" standard indiscriminately to claims arising under provisions of the FCRA and CCRAA that involve the accuracy of information. See *id.* (applying the standard to reinvestigation claims under § 1785.16); *Prianto v. Experian Info. Solutions, Inc.*, No. CV 13-03461 THE, 2014 WL 3381578, *3 (N.D. Cal. July 10, 2014) ("Thus, Plaintiff must allege facts sufficient to state a claim that a CRA published a report containing patently inaccurate or materially misleading information in order to state a prima facie case for relief under section[ ] 1681e(b)," citing *Chiang v. Verizon New England, Inc.*, 595 F.3d 26, 37 (1st Cir. 2010) (deeming the term "inaccurate" as used in § 1681i(a) to be "essentially the same" as the term "incomplete or inaccurate" in § 1681s–2(b)); *Cisneros*, 39 Cal.App.4th at 46 ("a report violates [§§ 1785.14 and 1785.16] when it is misleading or incomplete, even if it is technically accurate"). The court

1   must therefore decide whether Grigoryan has raised triable issues concerning the fact that

2   defendants reported patently incorrect or materially misleading information.

3         Trans Union does not cite any evidence that the Sequoia or CMI accounts actually belonged

4   to Grigoryan, i.e., that they were accurately placed on his credit report.  Nor do they argue that

5   they were.  They simply assert that Sequoia and CMI furnished that information.  Grigoryan, for

6   his part, has submitted a sworn declaration stating that the accounts did not belong to him.[124]  He

7   has therefore raised triable issues of fact as to whether Trans Union placed inaccurate information

8   on his credit report by listing the Sequoia and CMI account as Grigoryan's.

9         With respect to the BOA HELOC, defendants argue that there is evidence Grigoryan

10  missed a payment on September 9, 2010, and incurred late fees in September and October 2011.[125]

11  Defendants do not cite this evidence in their moving papers, however; this alone supports a finding

12  that they have not shown it is undisputed the information reported concerning the BOA HELOC

13  was accurate.  See *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001)

14  (holding that the district court "need not examine the entire file for evidence establishing [the

15  absence of] a genuine issue of fact, where the evidence is not set forth in the [moving] papers with

16

17  ────────────

18  [124]Grigoryan Decl., ¶ 36 ("On or about November 21, 2011, I telephonically disputed the
    [Sequoia] collection account with TRANSUNION as not belonging to me"), ¶ 48 ("I did not owe

19  any debt to CMI or [Time Warner Cable]").  Defendants object to Grigoryan's statement that he
    did not owe any debt to CMI as unauthenticated and lacking in foundation.  They also contend it

20  is hearsay. (Defendants' Objections to Plaintiff's Declaration ("Defendants' Objections"), Docket
    No. 78 (Nov. 24, 2014), ¶ 15.)  Defendants raise these objections repeatedly with respect to

21  various portions of Grigoryan's declaration.  Grigoryan's statement is plainly based on personal
    knowledge, and hence does not lack foundation.  The various exhibits to the declaration appear

22  to be communications sent or received by Grigoryan or copies of his credit reports.

23  Consequently, Grigoryan can testify that they are what they are claimed to be.  This adequately
    authenticates the exhibits under Rule 901(b)(1) of the Federal Rules of Evidence.  While the

24  declaration, in its current form, is technically hearsay, it is clear that these are matters to which
    Grigoryan can testify at trial.  See *Fonseca v. Sysco Food Servs. of Arizona, Inc.*, 374 F.3d 840,

25  846 (9th Cir. 2004) (concluding that hearsay evidence "could be presented in admissible form at

26  trial" and thus should have been considered in deciding a motion for summary judgment); *Fraser*

27  *v. Goodale,* 342 F.3d 1032, 1037 (9th Cir. 2003) (same).  The objections are therefore overruled.

28        [125]Opposition at 9-10.

                                        24

adequate references so that it could conveniently be found"); *Keenan v. Allan,* 91 F.3d 1275, 1279 (9th Cir. 1996) (the district court has no responsibility on summary judgment to "scour the record in search of a genuine issue of triable fact"); *Greenwood v. Fed. Aviation Admin.*, 28 F.3d 971, 977 (9th Cir. 1994) ("'[J]udges are not like pigs, hunting for truffles buried in briefs,'" quoting *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991) (per curiam)).

    The court has located three documents, however, that appear to support defendants' position. These are Exhibits 12, 13 and 14 to the declaration of Sabrina Fernandes. Exhibit 12 is an October 18, 2011 letter from BOA to Grigoryan that states Grigoryan's recent payment was "less than the amount needed to bring [his] loan up to date."[126] The letter advised that to bring the account current, Grigoryan needed to make an additional payment of $63.25.[127] Exhibit 13 is a "detailed outline of transactions" for the BOA HELOC account.[128] As defendants note, the exhibit shows that Grigoryan habitually incurred late fees, and suggests that he missed payments for September 2010 and August 2009 entirely.[129] The exhibit also reflects that Grigoryan made his September 2011 payment, but incurred substantial late fees during the months of September and October.[130] Finally, Exhibit 14 is a schedule that purportedly details payments Grigoryan made on the HELOC account; it indicates that the September 2011 payment was 30 days past due, and was changed to current in May 2012.[131]

    Grigoryan objects to this evidence, arguing that it is unauthenticated.[132] The court must agree. "A trial court can only consider admissible evidence in ruling on a motion for summary

---

[126]Fernandes Decl., Exh 12 (October 18, 2011 Letter from BOA) at 1.

[127]*Id.*

[128]*Id.*, Exh. 13 (January 15, 2013 Detailed Account Summary) at 1.

[129]*Id.* at 3-5.

[130]*Id.* at 5.

[131]*Id.*, Exh. 14 (Schedule of Payments) at 1.

[132]Opposition at 3.

judgment." *Orr v. Bank of America*, 285 F.3d 764, 774 (9th Cir. 2002) (citing FED.R.CIV.PROC. 56(e); *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)). Authentication is a "condition precedent to admissibility," which is satisfied by "evidence sufficient to support a finding that the matter in question is what its proponent claims." FED.R.EVID. 901(a). The Ninth Circuit has "repeatedly held that unauthenticated documents cannot be considered in [ruling on] a motion for summary judgment." *Orr*, 285 F.3d at 773 (collecting cases). "In a summary judgment motion, documents authenticated through personal knowledge must be 'attached to an affidavit that meets the requirements of [Fed.R.Civ.P.] 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence." *Id.* (quoting *Canada v. Blain's Helicopters, Inc.*, 831 F.2d 920, 925 (9th Cir. 1987) (alteration original)).

Exhibits 12, 13, and 14 are not authenticated because defendants failed to submit the declaration or deposition testimony of a BOA custodian of records, or someone else with personal knowledge of the contents of the documents, stating that they are what defendants represent them to be. Because defendants have attached the documents to Fernandes' declaration, Rule 56(e) requires that she have personal knowledge of them. Fernandes is not a BOA employee, nor does her declaration contain any information suggesting she otherwise has personal knowledge of the documents or their contents. The evidence is therefore unauthenticated and inadmissible. *Orr*, 285 F.3d at 777-78 ("Exhibit M purports to be a letter from Walshaw to Bourdeau, permitting Tahoe Bank to 'transact business preliminary to its organization.' It is not authenticated because Orr has failed to submit an affidavit or deposition testimony from Walshaw stating that he wrote the letter. Because Orr attempted to introduce Exhibit M by attaching it to Mirch's affidavit, Federal Rule of Civil Procedure 56(e) requires that Mirch have personal knowledge of the letter. . . . The district court's exclusion of Exhibit M was therefore proper").[133]

---

[133]Had the documents not been attached to Fernandes' declaration, defendants could have attempted to authenticate them through the alternate means permitted by Rule 901(b) and 902. Because they were not attached to an exhibit list, but to the declaration of a person lacking

(continued...)

Even were it to consider the exhibits, moreover, the court would find triable issues of fact regarding the accuracy of defendants' reporting of the BOA HELOC account. Grigoryan disputes the late payment status, and proffers what he contends is proof of payment.[134]   Although defendants are correct that a September 2011 payment stub is not sufficient to prove inaccuracy as a matter of law, because the fact a payment was made in September 2011 does not, in and of itself, indicate that the payment was timely, a reasonable jury could accept Grigoryan's statement that he made the payment on time, coupled with the payment stub, as true, and find that by reporting the account thirty days late, defendants issued inaccurate reports. Triable issues remain, therefore, concerning the accuracy of defendants' reports, which listed the BOA HELOC account thirty days late in September 2011.

Defendants dispute this conclusion. Citing *Gauci v. Citi Mortgage*, No. CV 11-01387 ODW, 2012 WL 1535654 (C.D. Cal. Apr. 30, 2012), they maintain that the Ninth Circuit deems credit reports accurate under the FCRA if a credit reporting agency correctly reports

---

[133](...continued)
personal knowledge sufficient to authenticate them, however, the documents must be excluded. See *Orr*, 285 F.3d at 777-78 ("Had Orr submitted the letter by attaching it to an exhibit list (rather than to Mirch's affidavit), the alternative means to authentication permitted by Federal Rule of Evidence 901(b) and 902 would have to be considered. Orr did not do so. The district court's exclusion of Exhibit M was therefore proper").

[134]Grigoryan Decl., ¶ 29 ("I also sent copies of my payment receipts from BOA, proving timely payments made on my BOA [HELOC] for the months of July, August, and September 2011. True and correct copies of my customer receipts dated July 15, 2011, August 15, 2011, and September 15, 2011 are attached hereto as EXHIBIT 'P'"). See also *id.*, Exh. P ("Receipts for BOA HELOC Payments) at 1-3. There appears to be some dispute as to whether defendants (at least Experian) actually received these payment receipts. (See Scott Decl., ¶ 21 ("Experian never received the . . . receipts attached to the Complaint as Exhibit P").) This is immaterial in determining whether Grigoryan has raised triable issues of fact concerning the accuracy of the credit reporting, however.

Defendants object to the receipts as unauthenticated hearsay. (Defendants' Objections, ¶ 9.) Grigoryan states in his declaration that he has personal knowledge of the documents; this suffices to authenticate the documents. although the exhibits are hearsay where offered for their truth, they can be considered as circumstantial evidence that payment was remitted. Defendants' objections are therefore overruled.

1   information furnished by the creditor.[135]   *Gauci*'s holding is premised entirely on that court's

2   reading of the Ninth Circuit's decision in *Carvalho*.  The court therefore begins by discussing

3   *Carvalho*.

4          In *Carvalho*, plaintiff's credit reports reflected a collection account that was $118 past due;

5   plaintiff did not contend that the account was not hers, that the amount past due was too high or

6   low, or that any of the listed dates were wrong.   *Carvalho*, 629 F.3d at 891.   In fact, she

7   conceded that the data was correct on its face.   The Ninth Circuit held that "[b]ecause all of the

8   relevant facts were correctly reported, there was no *patent* error in Carvalho's credit report."  *Id*.

9   (emphasis original).   Carvalho asserted, however, that there was a *latent* error in the reports.   She

10  contended that she was not legally obligated to pay the creditor because it had not properly billed

11  her insurer as allegedly required by an underlying agreement between the parties.  *Id*.  Carvalho

12  argued that the credit reporting agencies had to undertake "a searching inquiry" to determine the

13  validity of her defenses to payment.   As the Ninth Circuit described her argument, it was that

14  "consumers should be deemed innocent until proven guilty by a proper reinvestigation under the

15  FCRA and CCRAA."  *Id*.   The court rejected this argument, stating:

16          "The fundamental flaw in Carvalho's conception of the reinvestigation duty is that

17          credit reporting agencies are not tribunals.   They simply collect and report

18          information furnished by others.   Because [credit reporting agencies] are ill

19          equipped to adjudicate contract disputes, courts have been loath to allow consumers

20          to mount collateral attacks on the legal validity of their debts in the guise of FCRA

21          reinvestigation claims."  *Id*. (citing *Saunders v. Branch Banking & Trust Co. of*

22          *Va.*, 526 F.3d 142, 150 (4th Cir. 2008)).

23  The court noted in this regard the First Circuit's decision in *DeAndrade v. Trans Union LLC*, 523

24  F.3d 61 (1st Cir. 2008).   There, the dispute centered on whether DeAndrade had ratified an

25  allegedly fraudulent mortgage, such that his § 1681i claim was barred.  *Id*. at 68.   The First

26  Circuit found it unnecessary to resolve this issue, deciding instead that "[w]hether the mortgage

27  ───────────────

28          [135]Motion at 9.

1    is valid turns on questions that can only be resolved by a court of law" and is "a legal issue that

2    a credit agency such as Trans Union is neither qualified nor obligated to resolve under the

3    FCRA."  *Id.*  The proper recourse for DeAndrade, the court stated, was to file suit against the

4    creditor; DeAndrande had in fact already done so.[136]  The circuit observed that "[i]f a court had

5    ruled the mortgage invalid and Trans Union had continued to report it as a valid debt, *then*

6    DeAndrade would have grounds for a potential FCRA claim."  *Id.*  Barring this, however, it

7    concluded that DeAndrade's argument "crossed the line between alleging a factual deficiency that

8    Trans Union was obliged to investigate pursuant to the FCRA and launching an impermissible

9    collateral attack against a lender by bringing an FCRA claim against a consumer reporting

10   agency."  For that reason, the court found no inaccuracy.

11          After discussing *DeAndrade*, the Ninth Circuit

12          "agree[d] [with the First Circuit] that reinvestigation claims are not the proper

13          vehicle for collaterally attacking the legal validity of consumer debts. 'With respect

14          to the accuracy of disputed information, the CRA is a third party, lacking any direct

15          relationship with the consumer, and its responsibility is to "*re* investigate" a matter

16          once already investigated in the first place.' Hence, a consumer disputing the legal

17          validity of a debt that appears on her credit report should first attempt to resolve the

18          matter directly with the creditor or furnisher, which 'stands in a far better position

19          to make a thorough investigation of a disputed debt than the CRA does on

20          reinvestigation.' A CRA is not required as part of its reinvestigation duties to

21          provide a legal opinion on the merits. Indeed, determining whether the consumer

22          has a valid defense 'is a question for a court to resolve in a suit against the

23          [creditor,] not a job imposed upon consumer reporting agencies by the FCRA.'

24

25          ---

          [136]DeAndrade filed a declaratory relief suit in Rhode Island Superior Court concerning the

26   validity of the mortgage. "In that complaint, DeAndrade alleged that he and his wife never signed
     any documents granting a mortgage on their home to KeyBank and never authorized NESCOR to

27   do so on their behalf." *DeAndrade*, 523 F.3d at 63-64. The First Circuit does not discuss the
     status or outcome of the state court action.

28

1    Nor is a CRA obligated not to report any information about the disputed item

2    simply because the consumer asserts a legal defense. '[T]he very economic purpose

3    for credit reporting companies would be significantly vitiated if they shaded every

4    credit history in their files in the best possible light for the consumer.'" *Carvalho*,

5    629 F.3d at 892.

6    In *Gauci*, plaintiff sued various credit reporting agencies based on their reporting of late

7    payments on her mortgage. Like the plaintiff in *Carvalho*, she disputed the validity of the

8    increased mortgage payments. The court found that *Carvalho* "clearly settled that, under the

9    FCRA, a credit reporting agency's job is to correctly report information furnished by the

10   creditor[;] . . . credit reporting agencies are not supposed to adjudicate a consumer-creditor

11   dispute in order to issue credit reports." *Id.* at *6 (citing *Carvalho*, 629 F.3d at 891-92).

12   Applying this principle, it held that "[w]hen a credit reporting agency correctly reports the

13   information furnished by the creditor, the credit report is considered as 'accurate' within the

14   meaning of the FCRA, even when there is an ongoing dispute as to the validity of the debt." *Id.*

15   Defendants seize on this language in *Gauci*, and assert as a general proposition that if a

16   credit reporting agency accurately reports information furnished by a creditor – even if that

17   information is inaccurate – the consumer cannot show that the credit reporting agency prepared

18   a report containing inaccurate information and make out prima facie violation of § 1681e(b).

19   *Carvalho* and *Gauci* do not support such a rule; in both cases, it was undisputed that the report

20   of the debt was not inaccurate. Rather, in both cases, plaintiffs disputed the validity of the

21   underlying debt. Short of acting as a court of law, something they were ill-suited to do, the credit

22   reporting agencies could do nothing to resolve the dispute. Here, by contrast, Grigoryan does not

23   dispute the "validity" of the BOA HELOC, the Sequoia account, or the CMI account. Instead,

24   he challenges the accuracy of the information furnished by BOA, Sequoia, and CMI to defendants.

25   Although, as discussed *infra*, credit reporting agencies are entitled to rely on information

26   provided to them by furnishers for purposes of avoiding liability under § 1681e(b) and

27   § 1785.14(b), this does not preclude a consumer such as Grigoryan from making a prima facie

28   showing that information contained on a credit report is factually inaccurate.

30

1    This is born out by case law interpreting *Carvalho*.  In *Starkey v. Experian Info. Solutions,*

2    *Inc.*, No. CV 13-00059 JLS RNBx, 2014 WL 3809196, *3 (C.D. Cal. Jan. 8, 2014), for

3    example, plaintiff disputed whether certain items on her credit report pertained to her.  Experian

4    contended that *Carvalho* foreclosed recovery, because the furnisher had reported the accounts and

5    Experian had merely reflected information received from the furnisher in its report.  *Id*.  The court

6    disagreed.   Like Grigoryan, Starkey did "not argu[e] that her report contain[ed] a latent

7    inaccuracy, but [ ] instead raised a genuine factual dispute as to whether her credit report included

8    '*patent* error[s]' because certain items in the report did not even 'pertain to her.'"  *Id*.

9    Accordingly, the court found *Carvalho* distinguishable and found that Starkey had raised trial

10   issues concerning the inaccuracy of the report.  *Id.* at *3-4.

11   The court reached the same result in *Bradshaw v. BAC Home Loans Servicing, LP*, 816

12   F.Supp.2d 1066, 1071-72 (D. Or. 2011).  It found that plaintiff had made a prima facie showing

13   of inaccuracy and rejected defendant's contention that *Carvalho* barred such a finding.   It

14   observed: "Unlike the consumer in *Carvalho*, [the *Bradshaw*] plaintiffs [raise] several factual

15   disputes concerning [their] [BOA] account."  *Id.* at 1072.  Specifically, as Grigoryan does with

16   respect to the BOA HELOC, plaintiffs alleged "that they paid their mortgage on time, in contrast

17   to the multiple listings of late payments, and that the reported monthly payment amount and

18   amount past due are too high."  *Id*.  Consequently, the court found *Carvalho*, which did not

19   concern a patent inaccuracy, inapposite.

20   Numerous other courts have reached the same conclusion.  See *Nelson v. Ocwen Loan*

21   *Servicing, LLC*, No. CV 14-00419 HZ, 2014 WL 2866841, *3 (D. Or. June 23, 2014) ("Nelson

22   argues that his report was factually inaccurate and patently misleading because he never owed the

23   amount shown. Accordingly, his case is more analogous to cases such as *Bradshaw*, 816

24   F.Supp.2d at 1072, where the court found the plaintiffs established prima facie inaccuracy by

25   disputing the amount owed and whether the account was actually past due"); *Darrin v. Bank of*

26   *Am., N.A.*, No. CV 12-00228 MCE, 2014 WL 1922819, *6 (E.D. Cal. May 14, 2014) (holding

27   that because "[p]laintiff dispute[d] the accuracy of the statements, and not simply her legal

28   obligation to pay a debt[,] . . . *Carvalho* [did] not apply" ); accord *Saenz v. Trans Union LLC,*

621 F.Supp.2d 1074, 1080 (D. Or. 2007) (holding, prior to *Carvalho*, that plaintiff demonstrated a prima facie inaccuracy by adducing evidence that Trans Union continued to list  a collection balance outstanding despite the fact that it had previously been satisfied with a compromise payment).

Unlike the plaintiffs in *Carvalho* and *Gauci*, and like the plaintiffs in cases distinguishing *Carvalho*, Grigoryan has made a prima facie showing that his credit report contained patent errors.  He does not assail the validity of the BOA HELOC or his obligation to pay it; he simply argues that he *did* pay all outstanding sums, and that, because defendants reported the account as past due, his payments were inaccurately reflected in their reports.  See *Bradshaw*, 816 F.Supp.2d at 1072 (finding that there was a triable issue of fact as to inaccuracy where plaintiffs alleged they paid on time and defendant reported "multiple . . . late payments").

Similarly, Grigoryan contends that the Sequoia and CMI accounts are not his accounts; the *Carvalho* court expressly disclaimed any intent to address such a situation.  See *Carvalho*, 629 F.3d at 891 ("Carvalho does not contend that the CCS collection account does not pertain to her, that the amount past due is too high or low, or that any of the listed dates are wrong.  Indeed, she concedes that '[a]ll the data that shows in my credit report is correct' on its face.  Because all of the relevant facts were correctly reported, there was no *patent* error in Carvalho's credit report"); *Starkey*, 2014 WL 3809196, at *3 ("[Plaintiff] has [ ] raised a genuine factual dispute as to whether her credit report included '*patent* error[s]' because certain items in the report did not even 'pertain to her'").  Thus, the court finds that *Carvalho* and *Gauci* do not bar a finding of inaccuracy here.

**2.    Whether Defendants Were Entitled to Rely on the Information Reported by BOA, Sequoia, and CMI and Whether Defendants' Procedures for Ensuring Accuracy Were Reasonable**

Although triable issues of fact remain concerning the accuracy of defendants' BOA HELOC reporting and Trans Union's Sequoia and CMI account reporting, summary judgment is nonetheless properly entered in defendants' favor on Grigoryan's § 1681e(b) and § 1785.14(b) claims.  A credit reporting agency does not violate § 1681e(b) or § 1785.14(b) "simply by

32

reporting information that may be inaccurate." *Darrin*, 2014 WL 1922819 at *6 (citing *Saenz*, 621 F.Supp.2d at 1081). "If a consumer reporting agency accurately transcribes, stores and communicates consumer information received from a source that it reasonably believes to be reputable, and which is credible on its face, the agency does not violate [§ 1681e(b) or § 1785.14(b)] simply by reporting an item of information that turns out to be inaccurate." *Id.* (quoting *Saenz*, 621 F.Supp.2d at 1081 (in turn quoting 16 C.F.R. Pt. 600, App., § 607.3(A)); see also *Garrison v. Equifax Info. Servs., LLC*, No. CV 10-13990, 2012 WL 1278044, *7 (E.D. Mich. Apr. 16, 2012) ("a consumer reporting agency receiving a facially credible report from a source which it believes to be reputable is not liable merely because the report contains inaccurate information"); *Elsady v. Rapid Global Bus. Solutions, Inc.*, No. CV 09-11659, 2010 WL 742852, *4 (E.D. Mich. Feb. 26, 2010) ("CARCO is correct; there is no evidence suggesting that it had reason to doubt the accuracy of RGBSI's information prior to submitting the report to SAIC. . . . While Elsady's subsequent dispute may have triggered a duty to reinvestigate under § 1681i, it is not relevant to CARCO's investigative procedures under § 1681e(b)"). Although there is no case law on point, the court concludes that California courts would interpret the CCRAA similarly, and permit a credit reporting agency, as part of its "reasonable procedures to ensure accuracy" under § 1785.14(b), to rely on facially credible reports from reputable sources. See, e.g., *Olson,* 111 Cal.App.4th at 12 (stating that because the CCRAA "is substantially based on the Federal Fair Credit Reporting Act, judicial interpretation of the federal provisions is persuasive authority and entitled to substantial weight when interpreting the California provisions"); *Cisneros*, 39 Cal.App.4th at 575 (citing federal cases and concluding that under § 1785.14(b) and § 1785.16, "a credit reporting agency must have in place reasonable procedures to ensure maximum possible accuracy and follow them. If it does, then the fact that it erroneously reported unfavorable information does not subject it to liability").

Based on the undisputed evidence, the court concludes there are no triable issues of fact as to whether defendants violated § 1681e(b) and § 1785.14(b) by reporting the BOA HELOC as late in September 2011. It reaches the same conclusion with respect to Trans Union's reporting that the Sequoia and CMI accounts belonged to Grigoryan. Assuming these reports were

erroneous, there is no evidence that raises triable issues of fact concerning the reasonableness of defendants' § 1681e(b) and § 1785.14(b) procedures to ensure accuracy.   Grigoryan adduces no evidence, and does not argue, that defendants had reason to believe that BOA, Sequoia, and CMI were not reputable sources of information.   Thus, before Grigoryan disputed the thirty day late status of the BOA HELOC account and his ownership of the Sequoia and CMI accounts, thereby placing defendants on notice that the reported information might be inaccurate, defendants were entitled to rely on facially credible information received from BOA, Sequoia, and CMI.   See *Darrin*, 2014 WL 1922819 at *6 (quoting *Saenz*, 621 F.Supp.2d at 1081 (in turn quoting 16 C.F.R. Pt. 600, App., § 607.3(A)); *Garrison*, 2012 WL 1278044 at *7; *Elsady*, 2010 WL 742852 at *4.

Grigoryan proffers no evidence that defendants reported anything other than the information furnished to them by BOA, Sequoia, and CMI.   While Grigoryan, for example, argues that Trans Union reported accounts that did not belong to him, he does not dispute that Sequoia and CMI reported the accounts to Trans Union as his, nor that Trans Union simply reported the information that these furnishers provided to it.[137]   The fact that the information may have been inaccurate does not demonstrate that Trans Union did not employ reasonable procedures to ensure the accuracy of the information under § 1681e(b) and § 1785.14(b), as its obligations under these statutes "relate to the maintenance and operation of [its] own internal databases rather than to investigation of the accuracy of information received from external sources." *Saenz*, 621 F.Supp.2d at 1081.

The same is true of all defendants' reporting of the status of the BOA HELOC.   Grigoryan asserts that reporting that he was thirty days late in making his September 2011 payment was "patently incorrect," citing two BOA letters dated May 23 and May 30, 2012.[138]   Defendants object that the letters are unauthenticated, lack foundation, and contain inadmissible hearsay.   The court agrees that the letters are hearsay to the extent Grigoryan relies on them to prove that

---

[137]Opposition at 6-8.

[138]*Id*. at 3-4; Grigoryan Decl., Exhs. BB, CC.

34

defendants' reporting was inaccurate.[139]   Even if the court were to consider these documents, they
make it clear that BOA was reporting the account as delinquent prior to May 23, 2012.  Indeed,
the May 23, 2012 letter states that BOA "received [Grigoryan's] request for a credit report
adjustment related to [his] 09/2011 mortgage installment," and that the "correct information was

---

[139]Reply at 3 n. 1.  As noted, "[i]n a summary judgment motion, documents authenticated
through personal knowledge must be 'attached to an affidavit that meets the requirements of [Rule]
56(e) and the affiant must be a person through whom the exhibits could be admitted into
evidence." *Orr*, 285 F.3d at 773.  Here, the letters identify BOA as the sender and Grigoryan as
the recipient, and bear numerous indicia that they were sent by BOA.  The letters are attached to
Grigoryan's sworn declaration, who asserts he has personal knowledge of them.  This is sufficient
to authenticate and lay a foundation for the letters.  See *Logan v. City of Pullman*, 392 F.Supp.2d
1246, 1253 (E.D. Wash. 2005) ("However, because Plaintiffs attempted to introduce Exhibit C
by attaching it to Mr. Cochran's declaration, Rule 56(e) requires Mr. Cochran have personal
knowledge of the documents," citing *Orr*, 285 F.3d at 777).

   Nonetheless, the letters are hearsay because Grigoryan is offering them for the truth of
statements contained in them.  See FED.R.EVID. 801(c) (defining hearsay as "a statement, other
than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove
the truth of the matter asserted").  In the absence of a procedural rule or statute, hearsay is
inadmissible unless it is defined as non-hearsay under Rule 801(d) of the Federal Rules of
Evidence or falls within a hearsay exception under Rules 803, 804 or 807.  See FED.R.EVID. 802;
*Orr*, 285 F.3d at 778 (citing 30B K. & M. Graham, FEDERAL PRACTICE & PROCEDURE:
EVIDENCE § 7031 at 279).  Grigoryan offers the BOA letters to prove the truth of the matters
asserted therein, i.e., to prove that there were inaccuracies in his credit report that were *corrected*
and to prove that his HELOC payments were "never late."  (See Grigoryan Decl., Exhs. BB and
CC (May 23 and May 30, 2012 letters).)  Consequently, the letters are inadmissible hearsay.  See
*Giacalone v. Experian PLC*, No. CV 12-1192, 2013 WL 3199982, *2 (N.D. Ill. June 24, 2013)
("Giacalone has provided the consumer disclosure that he received and several letters of rejection
that denied his requests for credit.  On April 23, 2013, however, this Court granted Experian's
motion to strike these letters as inadmissible hearsay.  Giacalone has attempted to insert these
letters back into play through his affidavit in support of his reply to the instant motion; however,
the affidavit also constitutes in admissible hearsay.  As the letters and affidavit are inadmissible
hearsay, this Court cannot consider them, and Giacalone has offered no other evidence that would
lead the Court to conclude that there exists a consumer credit report containing the inaccurate debt
information, much less that third parties have seen such a report and have denied Giacalone credit
because of it").

   Had Grigoryan "relied [on the letters only as evidence of what was said or reported to
[him], not as evidence of the truth of any statement or record made," they would not be hearsay.
See *Spector v. Experian Info. Servs. Inc.*, 321 F.Supp.2d 348, 353 54 (D. Conn. 2004).  That
however, is not what Grigoryan has done.

submitted *on 5/23/2012* to the credit reporting agencies."[140]   While a factfinder could certainly decide that this is evidence that BOA inaccurately reported Grigoryan's failure to make his September 2011 HELOC payment in a timely fashion, and while it may suggest that defendants' *reinvestigation* procedures were inadequate, the May 23, 2012 letter proves, if anything, that BOA was the source of the inaccurate information, and that the erroneous reporting was not a product of defendants' internal procedures.

The May 30, 2012 letter, moreover, is irrelevant.  It states that "[a]ccording to [BOA's] records, [Grigoryan's] 10/2011 mortgage installment for the [HELOC] was never late," and that corrected information was sent to the credit reporting agencies on May 30, 2012.[141]   Grigoryan has never alleged that his October 2011 mortgage payment was incorrectly reported, however.[142] In his opposition, Grigoryan contends that the October 2011 reference "was . . . a typographical error, or perhaps a different way of characterizing the same thing[ –] negative credit reporting related to a 9/2011 late payment. . . ."[143]   The letter, however, unequivocally states that Grigoryan's "10/2011[ ] mortgage installment . . . was never late."  The court cannot ignore the actual text of the letter and indulge Grigoryan's suggestion that the letter contained a typographical error such that it says precisely what he wishes it to say.  Moreover, the May 23, 2012 letter states that BOA "received [Grigoryan's] request for a credit report adjustment related to [his] 09/2011 mortgage installment" and that the "correct information was submitted on 5/23/2012 to

---

[140]Grigoryan Decl., Exh. BB (May 23, 2012 letter from BOA) at 1-2.

[141]*Id.*, Exh. CC (May 30, 2012 letter from BOA) at 1.

[142]See, e.g., Complaint, ¶ 38 ("On or about October 26, 2011, immediately upon discovery of the inaccurate late payment reporting of September 2011, Plaintiff submitted disputes of this inaccurate reporting with Defendants"); *id.*, ¶¶ 42-43, 48, 55 (disputing the September 2011 late payment report).  The complaint does not reference an October 2011 late payment, nor has Grigoryan proffered any evidence that defendants reported that payment as late.

[143]Opposition at 4.

36

the credit reporting agencies."[144]   It would make little sense for BOA to send another letter one week later concerning the same payment stating that the same information had been submitted to the credit reporting agencies a second time on May 30, 2012.  In any event, the fact BOA had to "correct" the information once again indicates that it was misreporting information; the fact that BOA reported inaccurate is not proof that defendants' internal databases were improperly operated or maintained.  See *Saenz*, 621 F.Supp.2d at 1081 (§ 1681e(b), and by analogy § 1785.14(b), "relate to the maintenance and operation of [a credit reporting agency's] own internal databases rather than to investigation of the accuracy of information received from external sources").

Finally, to the extent Grigoryan adduces evidence of defendants' procedures, his proof relates exclusively to their reinvestigation procedures.  Specifically, he contends that after being alerted to inaccuracies in the credit reports, defendants did not "reach out to [him] to seek more information . . . or additional supporting documents"; did not "demand more detailed information" from BOA; and, "confronted with directly contradictory . . . assertions made by the consumer and their furnisher/subscriber, simply sided with the latter."[145]   These alleged inadequacies concern defendants' reinvestigation procedures under § 1681i and § 1785.16, i.e., what defendants should have done in response to Grigoryan's assertion that the BOA HELOC reporting was inaccurate.  As noted, § 1681e(b) obligations concern "the maintenance and operation of [a credit reporting agency's] own internal databases rather than to investigation of the accuracy of information received from external sources."  See *Saenz*, 621 F.Supp.2d at 1081 ("[W]hen a consumer reporting agency learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise) it must review its procedures for assuring accuracy.  Examples of errors that would require such review are the issuance of a consumer report pertaining entirely to a consumer other than the one on whom a report was

---

[144]See Grigoryan Decl., Exhs. BB and CC (May 23, 2012 and May 30, 2012 letters from BOA).

[145]Opposition at 7.

requested, and the issuance of a consumer report containing information on two or more consumers (e.g., information that was mixed in the file) in response to a request for a report on only one of those consumers," quoting 16 C.F.R. 600, § 607.3(A)).

Accordingly, evidence of inadequacies in defendants' reinvestigation procedures  under § 1681i or § 1785.16 is not probative of the fact that defendants have violated § 1681e(b) and § 1785.14(b).  See *Darrin*, 2014 WL 1922819 at *6 ("[C]ompliance with § 1681 e(b) and § 1681i are distinct inquiries, since § 1681 e(b) allows for a credit reporting agency to rely on information received from a source that it reasonably believes to be reputable"); *Elsady*, 2010 WL 742852 at *5 ("While Elsady's subsequent dispute may have triggered a duty to reinvestigate under § 1681i, it is not relevant to CARCO's investigative procedures under § 1681 e(b)"); *Saenz*, 621 F.Supp.2d at 1081 ("Saenz further argues that the reasonableness of Trans Union's reinvestigations following Saenz' two disputes of the NCO balance is material to the Section 1681e(b) inquiry.  Again, this court disagrees"); *Cairns v. GMAC Mortgage Corp*., No. CV 04-1840-PHX-SMM, 2007 WL 735564, *5-6 (D. Ariz. Mar. 5, 2007) (noting the difference between § 1681e(b) and § 1681i); see also *Henson v. CSC Credit Servs*., 29 F.3d 280, 286-87 (7th Cir. 1994) (affirming the dismissal of a § 1681e(b) claim on the ground that "a credit reporting agency may initially rely on public court documents, because to require otherwise would be burdensome and inefficient," but reversing dismissal of a § 1681i claim because "such exclusive reliance may not be justified once the credit reporting agency receives notice that the consumer disputes information contained in his credit report.  When a credit reporting agency receives such notice, it can target its resources in a more efficient manner and conduct a more thorough investigation").  Since Grigoryan proffers no evidence of inadequacies in defendants' internal databases, he has failed to raise triable issues of fact concerning his § 1681e(b) and § 1785.14(b) claims.[146]

---

[146]The court is mindful of the fact that reasonableness is a jury question in a overwhelming majority of cases. *Guimond*, 45 F.3d at 1333 ("The reasonableness of the procedures and whether the agency followed them will be jury questions in the overwhelming majority of cases").  This is not one of those cases, however.  Grigoryan adduces no evidence, and fails even to argue, that defendants' procedures for maintaining and operating their internal databases were not reasonable.

(continued…)

Because a consumer reporting agency receiving a facially credible report from a source that it believes to be reputable is not liable under § 1681e(b) or § 1785.14(b) merely because the report contains inaccurate information, and because Grigoryan has failed to adduce any evidence that BOA, Sequoia, and CMI are not reputable sources or that any of the alleged inaccurate reporting resulted from defendants' failure to maintain and operate their internal databases in a reasonable manner, the court grants summary judgment in defendants' favor on Grigoryan's § 1681e(b) and § 1785.14(b) claims.

### D.   Whether Triable Issues Preclude Granting Summary Judgment on Grigoryan's § 1681i and § 1785.16 Claims

Sections 1681i and 1785.16 obligate credit reporting agencies to reinvestigate disputes when the completeness or accuracy of information has been challenged.  Section 1681i(1)(A) provides:

> "[I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly, or indirectly through a reseller, of such dispute, the [CRA] shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file in accordance

---

[146](…continued)

Thus, there is no question to send to the jury, the claims fail, and judgment as a matter of law is properly entered in defendants' favor. See *Darrin*, 2014 WL 1922819 at *7 ("Because reporting information that may be inaccurate does not violate § 1681e(b) if such information is received via accuracy-assuring procedures, and because there are no allegations in the record that the CRA Defendants' procedures were unreasonable under § 1681e(b), Plaintiff's § 1681e(b) claim against the CRA Defendants fails"); *Saenz*, 621 F.Supp.2d at 1081 ("Because there is no evidence in the record from which a reasonable jury could infer that Trans Union's accuracy-assuring procedures were unreasonable, this court recommends granting Trans Union's motion in part, [and] dismissing Saenz' claims to the extent premised on violation of Section 1681e(b)").

with paragraph (5), before the end of the 30–day period beginning on the date on which the agency receives the notice of the dispute from the consumer or reseller." 15 U.S.C. § 1681i(1)(A).

Section 1785.16 is substantially identical. It states:

"If the completeness or accuracy of any item of information contained in his or her file is disputed by a consumer, and the dispute is conveyed directly to the consumer credit reporting agency by the consumer or user on behalf of the consumer, the consumer credit reporting agency shall within a reasonable period of time and without charge, reinvestigate and record the current status of the disputed information before the end of the 30-business-day period beginning on the date the agency receives notice of the dispute from the consumer or user, unless the consumer credit reporting agency has reasonable grounds to believe and determines that the dispute by the consumer is frivolous or irrelevant, including by reason of a failure of the consumer to provide sufficient information, as requested by the consumer credit reporting agency, to investigate the dispute." CAL. CIV. CODE § 1785.16(a).

As with claims under § 1681e(b) and § 1785.14(b), a consumer suing under § 1681i and § 1785.16 must make a "prima facie showing of inaccurate reporting." *Dennis*, 520 F.3d at 1069; see also *Carvalho*, 629 F.3d at 890 ("Because we believe California courts would find *Dennis* persuasive, we conclude that unless Carvalho has raised a genuine issue as to whether the disputed item was inaccurate, her CCRAA section 1785.16 claims fail as a matter of law"); see also *Cisneros*, 39 Cal.App.4th at 575 ("Under [§ 1785.14(b) and § 1785.16], a credit reporting agency must have in place reasonable procedures to ensure maximum possible accuracy *and follow them*. If it does, then the fact that it erroneously reported unfavorable information does not subject it to liability" (emphasis original)). As noted, there are triable issues as to whether defendants' reporting of the status of the BOA HELOC was inaccurate, and whether Trans Union's reporting of the CMI and Sequoia accounts was inaccurate. Grigoryan has thus adequately made a prima facie case of inaccurate reporting.

40

### 1.    Whether Defendants' Reinvestigation Procedures Were Reasonable

Defendants argue that Grigoryan has failed to identify any inadequacies in their reinvestigation procedures, and thus that summary judgment should be granted in their favor on his § 1681i and § 1785.16 claims.[147]

### a.    The BOA HELOC

Defendants argue that their reinvestigation procedures concerning the BOA HELOC were reasonable because they promptly initiated reinvestigations following receipt of Grigoryan's disputes.  Trans Union contends that it received disputes on October 31, 2011 and June 4, 2012, and that in each instance it promptly conducted a reinvestigation.[148]  Each of these reinvestigations was comprised solely of preparing and sending an ACDV to BOA.[149]

Experian received a letter from Grigoryan on November 4, 2011, disputing its reporting of the BOA HELOC as "Past due 30 days" with a balance of $12.[150]  Experian sent an ACDV to

---

[147]Motion at 11-18.

[148]Reger Decl., ¶¶ 25-28 (October 31, 2011 dispute and investigation), ¶¶ 41-42, 45 (June 4, 2012 dispute and reinvestigation).  Trans Union contends it received a request on April 30, 2012 as well, and immediately corrected the information disputed.  (*Id.*, ¶ 35 ("On April 30, 2012, Trans Union received a telephone call from Plaintiff regarding [the BOA HELOC].  In response to Plaintiff's telephone call, Trans Union promptly initiated reinvestigation using the ACDV process to confirm the accuracy of the information being reported.  On the same day, the remark code indicating the account information was disputed by the consumer was removed per Plaintiff's request and the investigation results were forwarded to plaintiff for his review").)  Grigoryan does not allege that he made such a request in his complaint, however, and does not suggest in his opposition that he intended to do so.  For that reason, the court need not address this request in deciding the motion.

[149]*Id.*, ¶ 26 ("On November 4, 2011, in response to Plaintiff's October 31, 2011 dispute request, Trans Union promptly initiated a reinvestigation into [the BOA HELOC account] using the ACDV process to confirm the accuracy of the information being reported"); *id.*, ¶ 41 ("On June 6, 2012, in response to the June 4, 2012 Quick Check received from Informative Research, Trans Union promptly initiated a reinvestigation into [the BOA HELOC account] to confirm the accuracy of the information being reported").

[150]Scott Decl., ¶ 17 ("On November 4, 2011, Experian received a letter from Plaintiff dated April 4, 2011, disputing his [BOA] account as inaccurately reporting").

BOA, which verified that the account was past due; it mailed the results to Grigoryan on November 14, 2011.[151]  On April 30, 2012, Grigoryan contacted Experian by telephone to ask that his consumer dispute comment be removed from the BOA HELOC account; the comment was removed the same day.[152]  Finally, on June 6, 2012, Experian received a four page fax from Grigoryan requesting that the HELOC be updated to current status.  The communication stated that Grigoryan no longer disputed the accuracy of the account.  Experian updated the account to current, never late, and no longer disputed.[153]

Equifax received a letter from Grigoryan on October 30, 2011, which it concluded disputed the accuracy of its reporting of the BOA HELOC.[154]  Equifax sent an ACDV to BOA regarding the account, and BOA responded, verifying the reporting of the account as accurate.[155]  Equifax thus made no changes to the account, and sent the results of its investigation to Grigoryan on November 7, 2011.[156]  Sometime before December 18, 2011, Equifax contends that it updated the

[151]*Id.*, ¶ 18 ("In response to the letter received on November 4, 2011, . . . Experian sent an [ACDV] to [BOA] . . . asking for verification of the account status and payment history of the account"); *id.*, ¶¶ 19-20 (BOA verified the account and Experian mailed results on November 14, 2011).

[152]*Id.*, ¶ 26 ("On April 30, 2012, Plaintiff contacted Experian via telephone and requested that his consumer dispute comment be removed from his [BOA HELOC account]. . . .  That same day, Experian removed Plaintiff's consumer dispute statement from the account and provided confirmation to Plaintiff").

[153]*Id.*, ¶ 27 ("On June 6, 2012, Experian received a four page fax requesting that the [BOA HELOC account] be updated to current and including a statement by the Plaintiff that he was no longer disputing the accuracy of the account.  Per the request, Experian updated the [BOA HELOC] to current, never late, and no longer disputed").

[154]Banks Decl., ¶ 45. See also *id.*, Exh. 3 (April 4, 2011 letter to Equifax).

[155]*Id.*, ¶ 51 ("Equifax sent an ACDV to BOA regarding the account.").  See also *id.*, Exh. 4 (November 2, 2014 Equifax ACDV to BOA).

[156]*Id.*, ¶¶ 52-54 (noting that BOA verified the accuracy of the reported information, that Equifax made no changes to its reporting, and that it sent the results to Grigoryan on November 7, 2011).

account such that a past due balance was no longer reported; it received no further inquiries on the account.[157]

Based on the undisputed evidence, defendants contend their procedures were reasonable; they assert that Grigoryan has failed to adduce evidence that any of the procedures were unreasonable. Grigoryan counters that reasonableness is a question of fact best suited for a jury, and that he need not identify specific inadequacies to raise triable issues.[158] See *Nelski v. Trans Union, LLC*, 86 Fed. Appx. 840, 845 (6th Cir. Jan. 15, 2004) (Unpub. Disp.) ("Generally, a plaintiff need not point to specific deficiencies in an agency's practices or procedures, citing *Morris v. Credit Bureau of Cincinnati, Inc.*, 563 F.Supp. 962, 968 (S.D. Ohio 1983) ("it is not plaintiff's burden to suggest ways in which defendant might improve its operation")). Grigoryan also contends that, notwithstanding the fact he need not adduce evidence of specific inadequacies, "specific deficiencies are quite apparent in this case." He notes that defendants' evidence indicates that, confronted with contradictory reporting, defendants simply sent ACDVs and sided with the furnishers.[159] He asserts this is especially troubling with respect to the BOA HELOC account, as he sent defendants payment receipts, and they proffer no evidence that they forwarded these to the furnishers in lieu of or in addition to sending an electronic form for routine verification.[160]

It is well settled that exclusive reliance on ACDV procedures does not suffice, as a matter of law, to establish that a "reasonable investigation" took place once a consumer disputes the accuracy of the furnisher's information. See *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F.Supp.2d 1066, 1073-74 (D. Or. 2011) ("Many courts, including this one, have concluded that where a CRA is affirmatively on notice that information received from a creditor may be suspect,

---

[157]*Id.*, ¶ 55 ("Prior to December 18, 2011, BOA updated the [HELOC account] so that it no longer reported a past-due status or a past-due balance of $12 (or any other amount).").

[158]Opposition at 7.

[159]*Id.*

[160]*Id.*

1    it is unreasonable as a matter of law for the agency to simply verify the creditor's information

2    through the ACDV process without additional investigation"); *White v. Trans Union, LLC*, 462

3    F.Supp.2d 1079, 1083 (C.D. Cal. 2006) ("TransUnion seeks to deflect responsibility for this

4    inaccuracy to the creditors upon whom it relies for information and falls back on its assertion that

5    'a creditor is in a better position than a consumer reporting agency with regard to the ability to

6    detect and correct errors in the reporting of a consumer's account.' . . . This hardly suffices to

7    establish, as a matter of law, that a 'reasonable reinvestigation' amounts to an inquiry that goes

8    only to confirmation of the accuracy of information from its original source"); see also *Cushman*

9    *v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) ("The 'grave responsibility' imposed

10   by § 1681i(a) must consist of something more than merely parroting information received from

11   other sources"); *Apodaca v. Discover Fin. Servs.*, 417 F.Supp.2d 1220, 1230-31 (D.N.M. 2006)

12   (noting that credit reporting agencies may not rely on automated procedures that make only

13   superficial inquiries once the consumer has notified it that information is disputed).

14          Thus, there are triable issues of fact with respect to the reasonableness of Trans Union's

15   investigations of October 31, 2011 and June 4, 2012; Experian's investigations of November 4,

16   2011, April 30, 2012, and June 6, 2012; and Equifax's investigation of October 30, 2011.[161]  The

17   fact that relying solely on ACDV procedures is unreasonable is especially clear where, as was the

18   case with respect to the October 30, 31, and November 4, 2011 reinvestigation requests,

19   "exclusive reliance on an ACDV system causes a reporting agency entirely to neglect its [s]ection

20   1681i(a)(2)(B) obligation to provide 'all relevant information' to the creditor from whom it

21   received disputed information, [and] its Section 1681i(a)(4) obligation to consider and review that

22   information independently."   *Saenz*, 621 F.Supp.2d at 1084.   Grigoryan contends he sent

23   defendants documentary evidence – in the form of payment receipts – to demonstrate that BOA

24

25          [161]Defendants did not completely fail to investigate the dispute, or ignore an unambiguous

26   public record.  There is therefore a jury question on whether their procedures were reasonable.

27   Cf. *Dennis*, 520 F.3d at 1070-71 (granting summary judgment for the consumer where a credit
     reporting agency failed to perform a simple search and overlooked an unambiguous document in

28   a court file showing that no adverse judgment had been entered against the consumer).

1    was inaccurately reporting his HELOC account as late.  There is no evidence that defendants

2    forwarded the receipts to BOA in conjunction with their October/November 2011

3    reinvestigations.[162]  For this reason as well, there are triable issues concerning the reasonableness

4    of defendants' reinvestigation procedures.  See *id*. ("Trans Union was provided with documentary

5    evidence sufficient to place it on notice of the likelihood that NCO's information was inaccurate.

6    A reasonable jury could infer from Trans Union's failure to provide NCO with copies or a

7    summary of the evidence it received, or to conduct any independent consideration or investigation

8    of Saenz' assertion that the balance had been paid, that the agency's reinvestigation was

9    unreasonable"); *Lambert v. Beneficial Mortg. Corp.,* No. CV 05–05468–RBL, 2007 WL

10   1309542, *4-5 (W.D. Wash. May 4, 2007) (finding a question of fact as to whether an ACDV

11   sent by a credit reporting agency contained sufficient information to comply with its

12   reinvestigation duties).

13          As respects Trans Union's June 4, 2012 reinvestigation, the court cannot find that Trans

14   Union was permitted, as a matter of law, simply to rely on the ACDV system after having

15   received complaints from Grigoryan regarding the accuracy of the reporting.  See *Bradshaw*, 816

16   F.Supp.2d at 1073-74 ("where a CRA is affirmatively on notice that information received from

17   a creditor may be suspect, it is unreasonable as a matter of law for the agency to simply verify the

18   creditor's information through the ACDV process without additional investigation"); see also

19   *Cushman*, 115 F.3d at 225 ("The 'grave responsibility' imposed by § 1681i(a) must consist of

20   something more than merely parroting information received from other sources"); *Apodaca*, 417

21   F.Supp.2d at 1230-31 (credit reporting agencies cannot rely on automated procedures that make

22   only superficial inquiries once the consumer has notified it that information is disputed).

23

24          [162]Grigoryan Decl., ¶ 29 ("I also sent copies of my payment receipts from BOA, proving
     timely payments made on my BOA [HELOC] for the months of July, August, and September

25   2011.  True and correct copies of my customer receipts dated July 15, 2011, August 15, 2011,

26   and September 15, 2011 are attached hereto as EXHIBIT 'P'").  See also *id.*, Exh. P ("Receipts
     for BOA HELOC Payments) at 1-3.  As noted, Experian disputes receiving the receipts.  There

27   is thus a triable issue of fact as to which party's evidence to credit; a jury will have to decide

28   whether Grigoryan or the Experian representative is the more credible witness.

The court reaches the same conclusion with respect to Experian's April 30 and June 6, 2012 reinvestigations.  Although the reports Grigoryan disputed were removed the same day he requested that Experian remove them, Experian admits it used only the ACDV process to verify the reporting.  A reasonable jury could thus find that Experian's procedures were unreasonable.

The court therefore declines to enter summary judgment in defendants' favor on Grigoryan's § 1681i and § 1785.16 claims pertaining to reinvestigation of the BOA HELOC.  The jury will have to determine whether the information reported was inaccurate and whether defendants' reinvestigation procedures were reasonable.

### b.    The Sequoia Account

Trans Union argues that its handling of the Sequoia account was reasonable as a matter of law, because it immediately initiated a reinvestigation of the account and advised Sequoia that Grigoryan disputed the account was his, and because it deleted the account on December 19, 2011, after Sequoia failed to respond to its reinvestigation.[163]  Because Trans Union did nothing more than send an ACDV, the court cannot conclude that Trans Union's conduct was reasonable as a matter of law.  Trans Union disputed this conclusion at the hearing, but was unable to cite any authority supporting its position, asserting that its reinvestigation cannot be deemed unreasonable because it resulted in the account being removed from Grigoryan's credit report within 30 days.  Trans Union did cite *Roybal v. Equifax*, No. CV 05-01207-MCE-KJM, 2008 WL 4532447, *6 (E.D. Cal. Oct. 9, 2008) – albeit only for its recitation of the elements of a § 1681i claim – and that case actually confirms the court's conclusion.  *Roybal* found that the reasonableness of the defendant credit reporting agencies' reinvestigations was a question of fact not fit for resolution on a motion for summary judgment.  See *id*. ("Reasonableness is typically a question of fact that should be left to the jury. . . .  Even if reasonableness was conducive to resolution on summary judgment, which it is not here, Defendants have not shown that they did,

---

[163]Reger Decl., ¶¶ 29-30.

1    indeed, act reasonably").[164]   Accordingly, the court denies summary judgment in favor of Trans

2    Union on this claim.

3                                    c.      **The CMI Account**

4         Trans Union argues that its reinvestigation of the CMI account was also reasonable as a

5    matter of law.   The court cannot agree.   Grigoryan contacted Trans Union by telephone on May

6    7, 2012, and by mail on May 9, 2012, disputing that the CMI account was his.[165]   Trans Union

7    sent an ACDV to CMI, which verified the account.   On June 1, 2012, Grigoryan again disputed

8    the CMI account.[166]   In response, Trans Union sent Grigoryan a letter stating that the dispute was

9    frivolous because the account had recently been verified as accurate.[167]   On June 7, 2012,

10   Grigoryan indicated that he would send Trans Union a fax containing information regarding the

11   accuracy of the CMI account.   Trans Union received the fax on June 14, 2012, and initiated a

12   follow-up reinvestigation.   It contends that CMI again verified the account, but that it Union

13   deleted the account from Grigoryan's credit file because CMI failed to confirm the social security

14   number associated with the account.[168]

15       The court concludes that triable issues of fact exist as to whether Trans Union's

16   reinvestigation procedures were reasonable.   Viewing the evidence in the light most favorable to

17   Grigoryan, a jury could conclude that Trans Union simply accepted CMI's version of the facts as

18   true.   Trans Union does not suggest that CMI was asked (or able) to verify Grigoryan's social

19   security number on May 7, 2012, the date of the initial reinvestigation.   Nor does it explain why

20

21   _____

22       [164]As discussed *infra*, however, the court concludes that the claim fails as a matter of law
     because Grigoryan cannot prove cognizable damages related to the reinvestigation of the Sequoia
23   account.

24       [165]*Id.*, ¶¶ 36-38.

25       [166]*Id.*, ¶ 40.

26       [167]*Id.*

27       [168]Reger Decl., ¶ 46 ("Trans Union removed the [CMI] account from Plaintiff's credit file
28   because Plaintiff's social security number was not verified by the furnisher").

                                              47

1  neglecting to do so – if it did – was reasonable under the circumstances.  Verifying the social

2  security number associated with an account would appear to be one of the most straightforward

3  (albeit not foolproof) methods of determining whether an account actually belongs to a specific

4  consumer.  Yet the record reflects that Trans Union waited more than a month, after multiple

5  requests by Grigoryan, to request such verification.  A jury will have to decide whether this

6  conduct was reasonable.  Trans Union's motion for summary judgment on Grigoryan's § 1681i

7  and § 1785.16 claims based on reporting of the CMI account is therefore denied.

8          **2.**      **Whether Grigoryan Can Prove Damages Supporting His Negligence-**

9                **Based FCRA and CCRAA Claims**

10          To establish a negligent violation of § 1681i and § 1785.16, a plaintiff must prove that he

11  incurred actual damages caused by the alleged violations.  See *Banga v. Experian Information*

12  *Solutions, Inc.*, 473 Fed. Appx. at 700 ("The district court properly granted summary judgment

13  on Banga's claims for negligent violations under § 1681o of the Act because she failed to raise a

14  triable dispute as to whether defendants' conduct resulted in actual damages"); *Banga v. First USA*

15  *NA*, __ F.Supp.2d __, 2014 WL 1158872, *6 (N.D. Cal. Mar. 20, 2014) ("To the extent this

16  claim alleges a negligent violation of the FCRA, summary judgment in favor of Chase is

17  warranted because Plaintiff has failed to adduce evidence raising a genuine issue for trial as to

18  whether she has suffered any actual damages caused by Chase"); see also *Wagner v. BellSouth*

19  *Telecom., Inc.*, 520 Fed. Appx. 295, 298 (5th Cir. Apr. 5, 2013) (Unpub. Disp.) (affirming

20  summary judgment where plaintiff "failed to establish actual damages that were proximately

21  caused by Equifax"); *Crabill v. Trans Union, LLC*, 259 F.3d 662, 664 (7th Cir. 2001) ("Without

22  a causal relationship between the violation of the statute and the loss of credit, or some other

23  harm, a plaintiff cannot obtain an award of 'actual damages'"); *Cahlin v. GMAC*, 936 F.2d 1151,

24  1161 (11th Cir. 1991) ("We stress that Cahlin had the affirmative duty of coming forward with

25  evidence supporting his claim that TRW's alleged inaccurate report caused him harm.  Despite

26  more than adequate opportunity for discovery, he has failed to meet this burden, and the district

27  court's grant of summary judgment in favor of TRW must be affirmed on this basis").

28

1    Defendants contend that Grigoryan cannot prove actual damages, because the business-

2    related damages he seeks are not recoverable under the FCRA or CCRAA, and because he has

3    failed to demonstrate that his emotional distress was caused by their alleged FCRA and CCRAA

4    violations.[169]

5        **a.    The Sequoia Account**

6        Trans Union asserts the Grigoryan cannot recover damages for any purportedly

7    unreasonable reinvestigation of the Sequoia account, because its reinvestigation resulted in

8    removal of the Sequoia account within the 30-day period prescribed by the statutes.  The court

9    agrees.  See *Acton v. Bank One Corp.*, 293 F.Supp.2d 1092, 1100 (D. Ariz. 2003) ("Equifax

10   further argues that Plaintiff cannot recover for the injury under § 1681i because Plaintiff cancelled

11   the Coventry Home contract on May 19, 1999, more than two weeks before Equifax's 30–day

12   reinvestigation period expired on June 5, 1999.  The Court agrees.  Plaintiff could not have been

13   damaged by Equifax's failure to comply with § 1681i until the 30–day reinvestigation period

14   expired.  By that time he had cancelled the Coventry Home purchase.  Equifax's failure to

15   reinvestigate did not cause the cancellation").  Because Grigoryan requested reinvestigation on

16   November 21, 2011,[170] and Trans Union deleted the account on December 19, 2011,[171] he cannot

17   demonstrate that he suffered damage due to any deficiencies in Trans Union's reinvestigation of

18   the Sequoia account.  For that reason, the court grants Trans Union's motion for summary

19   judgment on Grigoryan's § 1681i and § 1785.16 claims regarding the Sequoia account.

20       **b.    The BOA HELOC and CMI Accounts**

21           **(1)    Business-Related Damages**

22       In deposition testimony, Grigoryan did not dispute that the only economic damages he

23   alleges concern a real estate investment business he operates with his brother Aram Grigoryan,

24   and two other investors, George Halajyan and Hovhannes Azaryan, through a limited liability

25   _____

26   [169]*Id.* at 27-31, 34-35.

27   [170]SUF, ¶ 146; Reger Decl., ¶ 29.

28   [171]SUF, ¶ 147; Reger Decl., ¶ 30.

1  company, Graz Group LLC ("Graz Group").[172]  Aram explained at his deposition that "most of

2  the time," the partners purchase a property under Halajyan's or Grigoryan's name, and then

3  transfer it prior to closing or after closing by way of a quitclaim deed, to a newly formed limited

4  liability company whose sole purpose is to hold the investment.[173]  Grigoryan contends that from

5  2009 to 2012, he was unable to take advantage of approximately ten to fifteen real estate purchase

6  opportunities, resulting in an estimated loss of at least $1,000,000 to $1,500,000.[174]

7       As an initial matter, the court notes that Grigoryan cannot recover losses allegedly

8  sustained prior to the October/November 2011 reinvestigation requests he sent concerning the

9  BOA HELOC, because such losses do not relate to defendants' BOA HELOC or CMI account

10 reporting, and thus cannot have been caused by their alleged FCRA and CCRAA violations.

11       To the extent Grigoryan seeks damages based on lost real estate purchase opportunities or

12 the inability to purchase a Dickies Barbecue franchise, moreover, the court agrees with defendants

13 that these losses are not recoverable under the FCRA or CCPAA.  The FCRA permits a

14 "consumer" to obtain damages for violations, 15 U.S.C. §§ 1681n, 1681o, and defines a

15 consumer as "an individual."  See *id.*, § 1681a(c).  Similarly, the CCRAA permits "any

16 consumer" to recover damages, CAL. CIV. CODE § 1785.31(a)(1)-(2), and defines a consumer as

17 "a natural person."  See *id.*, § 1785.3(b).

18       Defendants contend that losses sustained by limited liability companies of which Grigoryan

19 was a member are not recoverable under either the FCRA or CCRAA.  See CAL. CORP. CODE

---

[172]See SUF, ¶ 170; Fernandes Decl., Exh. 17 ("Deposition of Aram Grigoryan ("A. Grigoryan Depo.")) at 14:18-22 ("Q. . . My question now is the partners in Graz Group. A. Graz Group. Q. So the partners are Hovhannes, you, and your brother Gevork. Correct? A. Yes. . . . [and] George, . . . is another partner we have, Halajyan").

[173]*Id.* at 14:23-15:15.

[174]Fernandes Decl., Exh. 16 (Deposition of Gevork Grigoryan ("Grigoryan Depo.")) at 214:14-18 ("Q. Okay. And how long of a period of time did [the inability to acquire investment properties] last? A. Close to three years. Q. So from 2009 to 2012 that was ongoing? A. Yes"); *id.* at 235:11-25 ("Q. So do you have a quantification of what your real estate losses are based on this negative reporting by [BOA]? A. . . . I would say at least – at least [a] million to million and a half dollars . . . – I would say. Q. Just the real estate losses? A. Just the real estate").

1   § 17701.04(a) ("A limited liability company is an entity distinct from its members"); *Denevi v.*
2   *LGCC, LLC*, 121 Cal.App.4th 1211, 1214 n. 1 (2004) ("Like corporate shareholders, members
3   of a limited liability company hold no direct ownership interest in the company's assets").  The
4   court agrees.  The limited liability companies Grigoryan formed with his partners are neither
5   parties to the dispute nor are they "consumers" under the FCRA or CCRAA.  For that reason,
6   any alleged damages they suffered cannot be recovered in this action.  See *Wisdom v. Wells Fargo*
7   *Bank NA*, No. CV 10-2400 PHX-GMS, 2012 WL 170900, *2 (D. Ariz. Jan. 20, 2012) ("Losses
8   suffered by Stand World Inc. or any other business entity predicated upon the fact that Plaintiffs
9   could not supply them with credit are simply not Plaintiffs' losses, and cannot be recovered in this
10  lawsuit.  Nor can Plaintiffs claim personal damages predicated upon the losses of an independent
11  corporation which it was their custom to supply with personal credit.  Therefore, to the extent
12  losses described in the complaint as 'lost business and profits,' or attributed to 'Mr. Wisdom's
13  business' are in fact the losses of a non-party corporation, they cannot be recovered in this action
14  regardless of their root cause").

15         Defendants also argue that any business damages sustained by Grigoryan as an individual
16  are not recoverable under the FCRA or CCRAA.   In *Johnson v. Wells Fargo Home Mortgage,*
17  *Inc.*, 558 F.Supp.2d 1114, 1125 (D. Nev. 2008), the court engaged in an extensive analysis of
18  this issue.  It focused on the FCRA's definition of a "consumer report."  Section 1681a(d)(1)
19  defines a consumer report as:

20         "[A]ny written, oral, or other communication of any information by a consumer
21         reporting agency bearing on a consumer's credit worthiness, credit standing, credit
22         capacity, character, general reputation, personal characteristics, or mode of living
23         which is used or expected to be used or collected in whole or in part for the purpose
24         of serving as a factor in establishing the consumer's eligibility for –
25         (A) credit or insurance to be used primarily for personal, family, or household
26         purposes;
27         (B) employment purposes; or
28

1    (C) any other purpose authorized under section 1681b of this title."  15 U.S.C.

2    §1681a(d)(1). [175]

3    The plaintiff in *Johnson* argued that § 1681b(a)(3)(F),[176] incorporated by reference in the

4    definition of a "consumer report," provided FCRA protection for a "business transaction that is

5    initiated by [a] consumer." *Johnson*, 558 F.Supp.2d at 1124.  The court disagreed.  *Id.*  It

6    "decline[d] to read § 1681b(a)(3)(F) so broadly as to essentially expand the scope and coverage

7    of the FCRA to include all business and commercial transactions" because "[t]o do so would

8    require ignoring an essential element included in § 1681b – *a consumer report*."  *Id.* (emphasis

9    original).   The court observed that "§ 1681b(a)(3)(F) does not state that all business and

10   commercial transactions initiated by an *individual* fall under this section." *Id.*  Thus, although the

11   statute defines a "consumer" as an individual, "the terms are not necessarily interchangeable. In

12   other words, a consumer must be an individual and cannot be a business or a group of people;

13   however, it does not follow that every transaction initiated by an individual is a consumer

14   transaction or that an individual is always acting in a consumer-capacity." *Id.* at 1125.  Finally,

15

16

17   ───────────────

     [175]As relevant here, the CCRAA definition of a consumer credit report is identical.  See
18   CAL. CIV. CODE § 1785.3(c) ("'Consumer credit report' means any written, oral, or other
19   communication of any information by a consumer credit reporting agency bearing on a consumer's
     credit worthiness, credit standing, or credit capacity, which is used or is expected to be used, or
20   collected in whole or in part, for the purpose of serving as a factor in establishing the consumer's
     eligibility for: (1) credit to be used primarily for personal, family, or household purposes, or
21   (2) employment purposes, or (3) hiring of a dwelling unit, as defined in subdivision (c) of Section
22   1940, or (4) other purposes authorized in Section 1785.11").

23   [176]Section 1681b(a)(3)(F) permits a credit reporting agency to furnish a credit report to any
     person which it has reason to believe "has a legitimate *business need* for the information – (I) in
24   connection with a business transaction that is initiated by the consumer; or (ii) to review an
25   account to determine whether the consumer continues to meet the terms of the account."  15
     U.S.C. § 1681b(a)(3)(F) (emphasis added).   Section 1785.11(a)(3)(F) of the CCRAA is
26   substantially the same.  See CAL. CIV. CODE § 1785.11(a)(3)(F) (permitting a credit reporting
     agency to furnishing a credit report to any person it has reason to believe "has a legitimate
27   business need for the information in connection with a business transaction involving the
28   consumer").

52

1  and most importantly, the court observed that circuit courts, including the Ninth Circuit, "ha[d]

2  given a narrow interpretation to the 'business transaction' language of § 1681b(a)(3)(F)." *Id.*

3      In *Mone v. Dranow,* 945 F.2d 306, 308 (9th Cir. 1991), the Ninth Circuit interpreted the

4  language of § 1681b(3)(E) – the predecessor to § 1681b(a)(3)(F)[177] – narrowly.    It noted that

5  "Congress intended the FCRA to authorize a credit reporting agency to issue a consumer report

6  to determine 'an individual's eligibility for credit, insurance or employment.'" *Id.* (citing 116

7  Cong. Rec. 36, 572 (1970) (Statement of Rep. Sullivan)).    Thus, it held that "[r]eports used for

8  'business, commercial, or professional purposes' are not within the purview of the statute," and

9  that such purposes do not give a third party a "business need" to obtain a consumer report. *Id.*

10  In reaching this conclusion, the Ninth Circuit cited *Houghton v. New Jersey Mfrs. Ins. Co.,* 795

11  F.2d 1144, 1149 (3d Cir. 1986), with approval.    There, the Third Circuit held that "to fall within

12  the business need exception of section 1681b(3)(E), a transaction 'must relate to one of the other

13  specifically enumerated transactions in §§ 1681a(d) and b(3), *i.e.*, credit, insurance eligibility,

14  employment, or licensing.'"    *Mone*, 945 F.2d at 308 (quoting *Houghton*, 795 F.2d at 1149).

15  Citing, *inter alia*, *Mone* and *Houghton*, the *Johnson* court observed that "no court has given [the

16  business transaction language of § 1681b(a)(3)(F)] such a broad and all-inclusive interpretation

17  as to include all of an individual's business and commercial transactions merely because they were

18  initiated by that individual."    558 F.Supp.2d at 1126.    It held that for a plaintiff to meet his

19  "burden of proving actual damages under the FCRA, [he] must show that each transaction at issue

20  involved the use of a consumer report.    If he cannot make that causal connection, his alleged

21  actual damages are not recoverable under the FCRA."    See *id.* at 1126-27.

22      Even before the Ninth Circuit held that consumer credit reports "used for business,

23  commercial, or professional purposes are not within the purview of the [FCRA]," *Mone*, 945 F.2d

24  at 308, it held that reports used to extend credit to businesses were not consumer credit reports

25  within the meaning of the CCRAA.    See *Mende v. Dun & Bradstreet, Inc.*, 670 F.2d 129, 132

26  _____

27      [177]"On September 30, 1997, § 1681b(3)(E), which read 'otherwise has a legitimate business
    need for the information in connection with a business transaction involving a consumer,' was
28  amended to § 1681b(a)(3)(F)." *Johnson*, 558 F.Supp.2d at 1125 n. 5.

1   (9th Cir. 1982).  The Federal Trade Commission, moreover, "has interpreted the FCRA to deny

2   protection for credit reports requested for commercial purposes, writing that '[a] report on a

3   consumer for credit or insurance in connection with a business operated by the consumer is not

4   a consumer report and the [FCRA] does not apply to it.'"  See *Wisdom*, 2012 WL 170900, at *2

5   (quoting 16 C.F.R. Pt. 600, App. § 603 cmt. (6)(B)).

6          Finally, the vast majority courts considering the issue have reached the same conclusion

7   as *Mone* and *Mende* – i.e., that the FCRA and CCRAA do not apply where a consumer report is

8   used for business purposes.  See, e.g., *Mathews v. Worthen & Trust Co.*, 741 F.2d 217, 219 (8th

9   Cir. 1984) ("We find that this particular transaction was exempt from the FCRA because the

10  credit report was used solely for a commercial transaction"); *Stich v. BAC Home Loans Servicing,*

11  *LP*, No. CV 10-01106 CMA MEH, 2011 WL 1135456, *4 (D. Colo. Mar. 29, 2011) ("Where

12  an individual's credit information is used to obtain credit for business purposes, as opposed to

13  personal purposes, courts have determined that the credit report does not fall within the realm of

14  the FCRA, which was implemented to protect consumers"); *George v. Equifax Mortgage Servs.*,

15  No. 06-CV-971 DLI LB, 2010 WL 3937308, *2 (E.D.N.Y. Oct. 5, 2010) ("It is well established

16  that the FCRA does not apply to business or commercial transactions, even when a consumer's

17  credit report impact[s] such transactions. . . .  Accordingly, Plaintiff's claim for damages due to

18  lost business opportunities is not actionable under the FCRA"); *Lucchesi v. Experian Info.*

19  *Solutions, Inc.*, 226 F.R.D. 172, 174 (S.D.N.Y. 2005) ("But even assuming that it, like the April

20  5 report, was a report about the Plaintiff, it too was issued in connection with a business operated

21  by the consumer, and thus cannot form the basis of liability under the FCRA"); *Natale v. TRW,*

22  *Inc.*, No. C 97–3661, 1999 WL 179678, *3 (N.D. Cal. Mar. 30, 1999) ("As a result, several

23  courts have held that where the purpose of a plaintiff's credit application was to secure credit for

24  business purposes, as opposed to personal, family or household purposes, the reporting agency's

25  conduct was not covered by the Act. . . .  Plaintiff responds that his businesses are sole

26  proprietorships and thus his situation is distinguishable from the cases cited by defendants.  The

27  form of ownership, however, is immaterial; the FTC and the case law hold that the FCRA does

28  not apply to transactions related primarily to businesses operated by the consumer"); *Yeager v.*

54

*TRW, Inc.*, 961 F.Supp. 161, 162 (E.D. Tex. 1997) ("FCRA does not apply to business transactions even those involving consumers and their credit information"); *Podell v. Citicorp Diners Club, Inc.*, 914 F.Supp. 1025, 1036 (S.D.N.Y. 1996) ("Jaffee's testimony establishes a causal connection between the adverse information in the credit reports issued by the defendants and the loss of plaintiff's opportunity to participate with Jaffee in the Florida real estate enterprise. Nonetheless, this sort of loss is not cognizable under the FCRA. . . . [I]t is generally held that a plaintiff may not recover under the FCRA for losses resulting from the use of the credit report solely for a commercial transaction"), aff'd, 112 F.3d 98 (2d Cir. 1997); *Wrigley v. Dun & Bradstreet, Inc.,* 375 F.Supp. 969, 970-971 (N.D. Ga. 1974) ("The court is constrained to the view that both the legislative history of the Act and the official administrative interpretation of the statutory terminology involved compel the conclusion that the Act does not extend coverage to a consumer's business transactions").

The court therefore concludes that Grigoryan cannot recover damages resulting from lost real estate investment ventures because either those damages were suffered by non-party, non-consumer limited liability companies, or reflect the use of a credit report for business or commercial purposes, outside the purview of the FCRA and CCRAA.

Grigoryan disputes this conclusion. He contends that the Ninth Circuit's decisions in *Dennis*, 502 F.3d 1066, and *Gorman*, 584 F.3d 1147, support the recovery of "business damages."[178] Both cases are distinguishable. The *Dennis* court held that a consumer had shown actual damages under the FCRA, *inter alia*, because he "hoped to start a business and . . . [hoped to] have a clean credit history when he sought financing for the venture." *Dennis*, 520 F.3d at 1069. The losses at issue in *Dennis* were in fact losses sustained by the consumer; the business he had hoped to start did not exist, and he was not suing for *business losses*. See *Wisdom*, 2012 WL 170900 at *2 (distinguishing *Dennis* because "the losses were sustained in fact by the consumer" and the "business which he hoped to start did not yet exist, and he was not suing for

---

[178]Motion at 8.

losses it had sustained").[179]  Indeed, as Dennis' opening brief in the Ninth Circuit makes clear, he did not seek business damages at all; rather, he sought "actual damages including emotional distress, an invasion of his privacy, humiliation, embarrassment, pain and suffering, damages to his credit rating, his ability  to obtain credit, and his ability to obtain credit at an interest rate or at . . . terms he would have been able to obtain had defendants not [violated the FCRA]."[180]

To the extent Grigoryan wished – like the plaintiff in *Dennis* – to recover for damages to his credit rating, his inability to obtain credit, or his inability to obtain credit at desirable rates, he was of course free to do so.  That is not what Grigoryan seeks, however.  He admitted at his deposition that he was "claiming . . . damages to the real estate investment business that [he] and [his] brother started together."[181]  Specifically, he contended that he and his brother "[w]ere trying to access part of th[e] equity [in Grigoryan's home]," which totaled approximately $900,000, to take advantage of "great deals" in the market during the recession.[182]  They sought to access the

-----

[179]The *Dennis* court did not discuss the specific transactions at issue.  The court is constrained to assume that the court did not find that business damages were recoverable, because the *Dennis* panel was not at liberty to abrogate the prior holding in *Mone* that reports obtained for business purposes are not protected by the FCRA.  See *Rodriguez v. AT & T Mobility Servs. LLC*, 728 F.3d 975, 979 (9th Cir. 2013) ("As a three-judge panel of this circuit, we are bound by prior panel decisions . . . and can only reexamine them when the[ ] 'reasoning or theory' of that authority is 'clearly irreconcilable' with the reasoning or theory of intervening higher authority," quoting *Miller v. Gammie,* 335 F.3d 889, 893 (9th Cir. 2003) (en banc)); see also *Mone*, 945 F.2d at 308 ("Reports used for business, commercial, or professional purposes' are not within the purview of the statute").

[180]See Appellant's Opening Brief, *Dennis v. BEH-1, LLC*, 520 F.3d 1066 (2008) (No. 04-56230), 2004 WL 3021004 at *12-13 ("As a direct and proximate result of the derogatory information furnished and reported by Experian, Dennis sustained actual damages including emotional distress, an invasion of his privacy, humiliation, embarrassment, pain and suffering, damages to his credit rating, his ability to obtain credit, and his ability to obtain credit at an interest rate or at . . . terms he would have been able to obtain had defendants not so acted.  He has abstained from applying for credit, had adverse action taken on existing credit accounts and was denied credit").

[181]Girgoryan Depo. at 133:3-6.

[182]*Id.* at 41:16-18.

1  equity to continue their traditional business of "purchas[ing] a property and then fix[ing] it up, .
2  . . [to] try to sell it for a profit later."[183]   The business relied on Grigoryan to supply it with credit;
3  he was the "main person" purchasing the properties.[184]   Because of his credit problems, the
4  business was unable to purchase properties, and "lost investors."   There is no doubt that the
5  claimed damages flow from Grigoryan's inability to supply credit to the real estate investment
6  business.   It is therefore beyond dispute that any credit report he may have used to secure
7  financing for such purchases, even though nominally a consumer credit report, was for a "business
8  purpose," i.e., purchasing, improving, and reselling homes.   It is therefore not deemed a
9  consumer credit report for purposes of the FCRA or CCRAA.  See, e.g., *Mone*, 945 F.2d at 308
10 (consumer credit reports "used for business, commercial, or professional purposes are not within
11 the purview of the [FCRA]"); *Mende,* 670 F.2d at132 (same with respect to CCRAA); see also
12 *Mathews*, 741 F.2d at 219 ("We find that this particular transaction was exempt from the FCRA
13 because the credit report was used solely for a commercial transaction"); *Stich*, 2011 WL 1135456
14 at *4 ("Where an individual's credit information is used to obtain credit for business purposes,
15 as opposed to personal purposes, courts have determined that the credit report does not fall within
16 the realm of the FCRA, which was implemented to protect consumers"); *Natale*, 1999 WL
17 179678, at *3 ("several courts have held that where the purpose of a plaintiff's credit application
18 was to secure credit for business purposes, as opposed to personal, family or household purposes,
19 the reporting agency's conduct was not covered by the Act").

20      Grigoryan's reliance on *Gorman* fares no better.   There, Gorman proffered evidence that
21 "he was refused credit or offered higher than advertised interest rates; the explanations given by
22 the creditors were delinquencies on his credit report; and the only delinquency is the MBNA
23 account."  *Gorman*, 584 F.3d at 1174.  Gorman also "maintain[ed] that he had to borrow money

24  ───────────────

25      [183]*Id.* at 30:23-31:3.

26      [184]*Id.* at 42:2-8 ("So once my credit is not there, and I was the main person that it was
27 purchased under, once my name was not there, then these investors – which we lost in my family,
   friend, investor like that, where after the Palmdale deals my credit was no good and we told him,
28 [he] said if you can't use your credit, why would I invest with you?").

at inflated interest rates, and that he lost wages from the time spent dealing with his credit problems." *Id*. The Ninth Circuit held that, under *Dennis,* this was "sufficient to establish causation and damages." *Id*. Nothing in the opinion indicates that Gorman sought to recover business damages, however, and nothing in the Ninth Circuit's opinion stands for the proposition that business damages are recoverable in a FCRA or CCRAA action.

Finally, even were business damages recoverable, the court notes that Grigoryan has not demonstrated that defendants' alleged violations of the FCRA and CCRAA proximately caused any purported business damages, whether allegedly suffered directly by him or by his business. In his declaration in opposition to defendants' motion for summary judgment, Grigoryan confirms that it was his inability to access the equity in his home that led to the alleged business damages.[185] He proffers a letter from New Wave Reality Group, stating that because of the late BOA payment, it could not refinance his home loan when he "came to [its] office [in] Dec[ember] 2009."[186] Because the earliest violations for which Grigoryan can sue concern the BOA HELOC and accrued thirty days after defendants received Grigoryan's reinvestigation requests on October 30, 31, and November 4, 2011, Grigoryan "could not have been damaged by [defendants'] failure to comply with § 1681i until the 30–day reinvestigation period expired" on November 29 and 30, 2011 and December 3, 2011.  See *Acton*, 293 F.Supp.2d at 1100 ("Equifax further argues that Plaintiff cannot recover for the injury under § 1681i because Plaintiff cancelled the Coventry Home contract on May 19, 1999, more than two weeks before Equifax's 30–day reinvestigation period expired on June 5, 1999.  The Court agrees.  Plaintiff could not have been damaged by Equifax's failure to comply with § 1681i until the 30–day reinvestigation period expired.  By that time he had cancelled the Coventry Home purchase.  Equifax's failure to reinvestigate did not cause the cancellation.").   Thus, even assuming *arguendo* that business damages could be recovered, because Grigoryan was denied refinancing prior to November 29, 2011, and because he adduces

---

[185]Grigoryan Decl., ¶ 51 ("Since I was unable to refinance the family house . . . I was unable to make use of the equity in the house . . . .").

[186]*Id*. at 1.

no evidence that he was denied the ability to refinance his home after the reinvestigation period ended in late November/early December 2011, he cannot show that defendants' alleged FCRA and CCRAA violations proximately caused any purported business damages. Summary judgment is warranted for this reason as well. See *Banga v. Experian Information Solutions, Inc.*, 473 Fed. Appx. at 700 ("The district court properly granted summary judgment on Banga's claims for negligent violations under § 1681o of the Act because she failed to raise a triable dispute as to whether defendants' conduct resulted in actual damages"); *Crabill v. Trans Union, LLC*, 259 F.3d at 664 ("Without a causal relationship between the violation of the statute and the loss of credit, or some other harm, a plaintiff cannot obtain an award of 'actual damages'"); *Cahlin v. GMAC*, 936 F.2d at 1161 ("We stress that Cahlin had the affirmative duty of coming forward with evidence supporting his claim that TRW's alleged inaccurate report caused him harm. Despite more than adequate opportunity for discovery, he has failed to meet this burden, and the district court's grant of summary judgment in favor of TRW must be affirmed on this basis").[187]

---

[187]Grigoryan makes a passing reference in his declaration to the fact that "around the time that the BOA [HELOC] was being reported late, [he] wanted to invest in a Dickies Barbecue franchise" but "was unable to do [so] with the equity [in his home] being tied up as a result of the inaccurate reporting. Grigoryan contends that, after the credit issues were resolved, he "was able to buy the franchise, and now [makes] a profit every month from that business." (Grigoryan Decl., ¶ 52.) To the extent Grigoryan seeks to recover damages based on his inability to invest in a Dickies Barbecue franchise at an earlier point in time, the court cannot agree for a number of reasons. Initially, this is the first time that Grigoryan has claimed damages arising out of inability to invest in a Dickies Barbecue franchise. At his deposition, he stated that the only economic damages he sought concerned his real estate investment business. (See Grigoryan Depo. at 133:12-18 ("Q. Any other category of damages that doesn't fall into those that you're claiming as you sit here today? And let me recap them. All right? Emotional distress related type damages, the business related investment work that you and your brother do with real estate. Correct? A. Yes. Q. The limits on some of your credit accounts, credit cards, equity lines of credit, those types of things. Correct? A. Correct. Q. Attorneys' fees – A. Yes").) Because Grigoryan did not disclose the fact that he allegedly suffered damage due to his inability to acquire a Dickies Barbecue franchise, defendants could seek to have the evidence excluded. See FED.R.CIV.PROC. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless"); *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001)

(continued…)

Consequently, the court grants summary judgment in favor of defendants on Grigoryan's claims for negligent violation of the FCRA and CCRAA to the extent he seeks to recover damages

---

[187](...continued)

("Rule 37(c)(1) gives teeth to these requirements by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed"). Defendants have not moved to exclude the evidence under Rule 37, however, and the court will not exclude it on that basis for purposes of this motion.

Further, although Grigoryan references the Dickies Barbecue franchise in his declaration, the subject is not addressed in his opposition, despite the fact that it is clear from their moving papers that defendants believe the only economic damages at issue are those associated with Grigoryan's real estate investment business. As the court earlier noted, it "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." See *Carmen*, 237 F.3d at 1031; see *Keenan*, 91 F.3d at1279 (the district court has no responsibility on summary judgment to "scour the record in search of a genuine issue of triable fact"). Because Grigoryan makes no reference to this evidence in his opposition, the court could conclude that he abandoned any claim to such damages. See *Kennan*, 91 F.3d at 1279 ("[The nonmoving party's] burden to respond is really an opportunity to assist the court in understanding the facts. But if the nonmoving party fails to discharge that burden-for example, by remaining silent-its opportunity is waived and its case wagered," quoting *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 405 (6th Cir. 1992)).

There is a more fundamental reason why the reference does not raise triable issues of fact, however. Although he states that he was seeking to invest in the franchise "around the time that the BOA [HELOC] was being reported late," he proffers no evidence that he actually sought and was denied credit, or that he submitted a franchise application that was denied because of poor credit. There is thus no evidence of causation. Grigoryan asserts that he was unable to obtain the franchise because he was unable to access the equity in his home. As the court has already explained, however, the only evidence Grigoryan has adduced shows that he sought to refinance his home in December 2009. This was more than a year before defendants' alleged FCRA and CCRAA violations. Grigoryan thus cannot prove that the purported violations proximately caused any damage he might have suffered in connection with his purported inability to invest in a Dickies Barbecue franchise. See *Banga*, 473 Fed. Appx. at 700 ("The district court properly granted summary judgment on Banga's claims for negligent violations under § 1681o of the Act because she failed to raise a triable dispute as to whether defendants' conduct resulted in actual damages"). Summary judgment is proper for this reason as well.

1   connected to his real estate investment business or his alleged attempt to invest in a Dickies

2   Barbecue franchise.[188]

3                          **(2)     Emotional Distress Damages**

4              Defendants also contend that Grigoryan cannot prove he suffered emotional distress

5   caused by an alleged FCRA or CCRAA violation.[189]   "Damages recoverable under the FCRA

6   'include humiliation or mental distress, even if the consumer has suffered no out-of-pocket losses'

7   due to a denial of credit."   *Waddell v. Equifax Info. Servs., LLC*, No. CV 05-0092 PHX DGC,

8   2006 WL 2640557, *4 (D. Ariz. Sept. 14, 2006) (quoting *Stevenson v. TRW Inc.*, 987 F .2d 288,

9   296 (5th Cir. 1993)).   "Courts have allowed recoveries where . . . the plaintiff suffered mental

10  anguish based on events other than a denial of credit."   *Id.* (citing *Zala v. Trans Union, LLC*, No.

11  CV 99-0399, 2001 WL 210693, *7 (N.D. Tex. Jan. 17, 2001) ("[A]lthough the court agrees that

12  Zala cannot recover damages from Trans Union based on the decisions by Washington Mutual and

13  Sebring [to deny credit or charge higher interest rates because they did not rely on the erroneous

14  credit report entry], this does not preclude Zala from recovering other damages that he seeks in

15  this case and that are available under the FCRA, and the court's decision in this respect does not

16  apply to those damages claims")); see also *Guimond,* 45 F.3d at 1333 ("[N]o case has held that

17  a denial of credit is a prerequisite to recovery under the FCRA").

18             Defendants contend that Grigoryan has no corroborating medical or psychological evidence

19  to support an award of damages for emotional distress or mental anguish, and that such evidence

20  is required.[190]   "The Ninth Circuit has not addressed the type of evidence necessary to support an

21  award of emotional distress damages under the FCRA, but has stated in other contexts that

22  '[w]hile objective evidence requirements may exist in other circuits, such a requirement is not

23

24            _____

25         [188]Because business damages are not recoverable, the court need not address defendants'
    contention that Grigoryan's alleged business damages cannot be recovered because they are too
26  speculative.  (Motion at 31-34.)

27         [189]Motion at 34-35.

28         [190]*Id.* at 35.

                                                    61

imposed by case law in the Ninth Circuit, or the Supreme Court.'" *Acton*, 293 F.Supp.2d at 1101 (citing *Zhang v. Am. Gem Seafoods, Inc.,* 339 F.3d 1020, 1040 (9th Cir. 2003) (holding in a discrimination action that the plaintiff's "testimony alone is enough to substantiate the jury's award of emotional distress damages" (ellipsis and citations omitted)); *Johnson v. Hale,* 13 F.3d 1351, 1352–53 (9th Cir. 1994) (recognizing that "compensatory damages may be awarded for humiliation and emotional distress established by testimony or inferred from the circumstances, whether or not plaintiffs submit evidence of economic loss or mental or physical symptoms"); see also *Nelson v. Equifax Info. Servs., LLC*, 522 F.Supp.2d 1222, 1235 (C.D. Cal. 2007) (same).

Thus, district courts in the Ninth Circuit do not require objective evidence of emotional distress, but instead allow a plaintiff's testimony alone to support an award of emotional distress damages. See *Nelson*, 522 F.Supp.2d at 1235 ("Based on Ninth Circuit precedent, the Court finds that Nelson's testimony alone can sufficiently establish emotional distress damages, such that a jury could find in her favor on that issue. Specifically, Nelson testified at her deposition that, as a result of the disputed Account repeatedly reappearing on her credit report, she feels stigmatized, has fights with her partner, difficulty sleeping, recurring fear, vomiting, and sick stomach"); *Waddell*, 2006 WL 2640557 at *4 (testimony that "Equifax's failure to provide the requested address information caused [plaintiff] emotional distress severe enough to result in physical symptoms," i.e., "caused her to cry, have her spine tighten up, raise her blood pressure, and have a panic attack," and "negatively affected" relationship with her husband and daughter created a jury question regarding emotional distress damages); *Acton*, 293 F.Supp.2d at1100 ("Plaintiff claims that Equifax's failure to correct his credit report and the continuing hassle to correct the error 'devastated' him and his wife. Plaintiff claims he had to take unpaid leave from work so he could deal with the stress of the credit situation, had difficulty sleeping, and was required to take large amounts of Tylenol. Plaintiff also claims that he was embarrassed by the fact that others in the community unjustifiably perceived him and his wife as bankrupt. . . .  While the Plaintiff certainly has not offered overwhelming evidence of emotional distress damages, the evidence is sufficient to create a question for the jury, particularly when all factual disputes and possible

1  inferences are resolved in the Plaintiff's favor.  The Court will therefore deny Equifax's motion

2  for summary judgment regarding emotional distress damages").

3        Nor do California courts require the specificity that defendants demand.  See *Cisneros*, 39

4  Cal.App.4th 548, 580 ("Defendants contend that the trial court wrongly awarded Ms. Cisneros

5  and Ms. Pettus a total of $350 for 'pain and suffering' when there was no evidence to indicate that

6  their 'emotional distress' was severe.  We infer from the amount of the awards that the distress

7  was not severe.  Ms. Cisneros and Ms. Pettus were clearly wronged by UDR, and the minimal

8  amount awarded by the trial court can be justified as nominal damages").  As a result, defendants'

9  argument that Grigoryan cannot recover emotional distress damages because he has adduced no

10  corroborating testimony or medical or psychological evidence is unpersuasive.

11        Defendants next contend that Grigoryan has failed to establish that any emotional distress

12  he suffered was caused by the alleged FCRA and CCRAA violations.  Citing his deposition

13  testimony, they maintain that the only pain and suffering Grigoryan has identified is distress he

14  suffered as a result of his inability to access the equity in his home.  Grigoryan testified that he

15  was stressed because he was "[u]nable to access the equity in [his] property to be able to invest

16  in more properties" and "in other business ventures."[191]  He also testified that he felt humiliated

17  due to deterioration of his "reputation with investors or people in the industry."[192]  The question

18  is whether he has proffered evidence linking his inability to access the equity in his property to

19  the alleged FCRA and CCRAA violations.  In his declaration, he asserts that Citibank suspended

20  his home equity line of credit, and that New Wave Reality Group denied his refinancing

21
22
23

24        [191]See Grigoryan Depo. at 197:13-14, 197:22-23.

25        [192]*Id.* at 199:2-12 ("It's like you set yourself a reputation with investors or people in the
26  industry, and all of a sudden your reputation is down the drain because of the fact that a mistake
27  that you haven't even done, a mistake that credit reporting agencies are doing [is] causing you to
28  seem like a dead beat, like they think that, hey, this guy can't afford to pay his bills on time or
    so and so, and that's not the case.  I'm here doing everything correctly").

application "[a]fter the inaccurate late payment reporting for the month of December 2009."[193]
In addition, he proffers four documents as proof of the linkage between defendants' alleged
violations and his inability to access the equity in his property.  Defendants object to this evidence
as unauthenticated hearsay.[194]  The court agrees that the documents are hearsay to the extent relied
on for the truth of the matters stated in them.  Even if they were admissible, however, they do not
support Grigoryan's claim that his emotional distress was caused by inability to access the equity
in his property.  The first document is a letter from Citi dated March 5, 2010; it states that
"[b]ased on Citibank's recent review of [Grigoryan's] credit bureau report, there ha[d] been a
material change in [his] financial circumstances" and that, "[a]s a result, [it was] suspending [his]
[HELOC]."[195] Grigoryan also proffers a letter from New Wave Reality Group, stating that because
of the late BOA payment, it could not refinance his home loan when he "came to [its] office [in]
Dec[ember] 2009."[196]  A third exhibit, also from Citibank, indicates that it suspended the HELOC
on March 5, 2010 and again on October 20, 2011.[197]  Finally, Grigroyan proffers a November 9,
2011 letter from Citi, which states that it had closed his HELOC account due to the Trans Union
credit report.[198]  Because the earliest violations for which Grigoryan can sue concern the BOA
HELOC and accrued thirty days after defendants received Grigoryan's reinvestigation requests
on October 30, 31, and November 4, 2011, Grigoryan "could not have been damaged by
[defendants'] failure to comply with § 1681i until the 30–day reinvestigation period expired" on
November 29 and 30, 2011 and December 3, 2011.  See *Acton*, 293 F.Supp.2d at 1100 ("Equifax
further argues that Plaintiff cannot recover for the injury under § 1681i because Plaintiff cancelled

[193]Grigoryan Decl., ¶ 19.

[194]Defendants' Objections, ¶¶ 5, 16.  The documents are adequately authenticated,
however, because Grigoryan testifies to their contents, and has personal knowledge of them.

[195]Grigoryan Decl., Exh. M (Letters from Citibank and New Wave Reality Group) at 2.

[196]*Id*. at 1.

[197]*Id*., Exh. GG (October 20, 2011 and November 9, 2011 letters from Citibank) at 2.

[198]*Id*. at 1.

the Coventry Home contract on May 19, 1999, more than two weeks before Equifax's 30–day

reinvestigation period expired on June 5, 1999.  The Court agrees.  Plaintiff could not have been

damaged by Equifax's failure to comply with § 1681i until the 30–day reinvestigation period

expired.  By that time he had cancelled the Coventry Home purchase.  Equifax's failure to

reinvestigate did not cause the cancellation.").   Thus, because all of the alleged account closures

and credit denials occurred prior to November 29, 2011 – the earliest date on which liability could

be imposed for unreasonable reinvestigation – no rational trier of fact could find that defendants'

conduct caused any emotional distress arising out of these failures to access the equity in his

property.  See *Banga*, 2014 WL 1158872 at *6 ("To the extent this claim alleges a negligent

violation of the FCRA, summary judgment in favor of Chase is warranted because Plaintiff has

failed to adduce evidence raising a genuine issue for trial as to whether she has suffered any actual

damages caused by Chase"); see also *Banga*, 473 Fed. Appx. at 700 ("The district court properly

granted summary judgment on Banga's claims for negligent violations under § 1681o of the Act

because she failed to raise a triable dispute as to whether defendants' conduct resulted in actual

damages"); *Casella v. Equifax Credit Info. Servs.*, 56 F.3d 469, 474 (2d Cir. 1995) (affirming

summary judgment for failure to proffer evidence of causation); *Acton*, 293 F.Supp.2d at 1100

("Plaintiff could not have been damaged by Equifax's failure to comply with § 1681i until the

30–day reinvestigation period expired.  By that time he had cancelled the Coventry Home

purchase.  Equifax's failure to reinvestigate did not cause the cancellation").      Grigoryan

does not premise emotional distress damages solely on his inability to access the equity in his

property, however.  He also asserts he suffered emotional distress as a result of the ongoing

struggle in which he engaged to correct the credit reports.  In his declaration, he states that

> "the whole experience with the credit reporting agencies has been an on-going
>
> nightmare. . . .  The fact that I was constantly being portrayed in my credit reports
>
> as delinquent when I was not delinquent was outrageous to me.  It caused me stress
>
> and anxiety, frustration and occasionally hopelessness.  The on-going struggle with
>
> the Defendants distracted me from the ordinary joys of life, and the stress of having
>
> to deal with the situation made me moody and ill-tempered with my family, and no

doubt I treated them worse than they deserved – a fact that sill causes me guilt.  The additional stress caused me to lose sleep, and being deprived of sleep in turn made me more agitated – it was a vicious cycle."[199]

He contends he suffered these damages as a result of defendants' inaccurate reporting of the BOA HELOC and Trans Union's inaccurate reporting of the CMI account.[200]

"While [Grigoryan] certainly has not offered overwhelming evidence of emotional distress damages, the evidence is sufficient to create a question for the jury, particularly when all factual disputes and possible inferences are resolved in [his] favor."  See *Acton*, 293 F.Supp.2d at 1100 (concluding that the evidence was sufficient to create a jury question where plaintiff claimed "that Equifax's failure to correct his credit report and the continuing hassle to correct the error 'devastated' him and his wife"; that "he had to take unpaid leave from work so he could deal with the stress of the credit situation, had difficulty sleeping, and was required to take large amounts of Tylenol"; and "that he was embarrassed by the fact that others in the community unjustifiably perceived him and his wife as bankrupt"); see also *Nelson*, 522 F.Supp.2d at 1235 ("Based on Ninth Circuit precedent, the Court finds that Nelson's testimony alone can sufficiently establish emotional distress damages, such that a jury could find in her favor on that issue.  Specifically, Nelson testified at her deposition that, as a result of the disputed Account repeatedly reappearing

---

[199]Grigoryan Decl., ¶ 53.  Defendants object to this statement, arguing that it constitutes inadmissible expert testimony and lacks foundation.  (Defendants' Objections, ¶ 20.)  Clearly, Grigoryan's statements do not constitute expert testimony; he merely relates firsthand how defendants' alleged violations made him feel.  Nor do the statements lack foundation, as they are based on Grigoryan's personal knowledge and experience.  Defendants' objections are therefore overruled.

[200]*Id.*, ¶ 54 ("What was especially troubling was the fact that the Defendant seemed to automatically trust BOA's reporting on [the HELOC] even though BOA had earlier corrected its error on the first account.  And, even after I sent payment receipts from BOA, the Defendants ignored them.  Similarly TRANS UNION allowed the [CMI account] to resurface from a new collector. . . .  It just seemed impossible to win; nothing I said seemed to make a difference").  Defendants object to this evidence; they contend that it is unauthenticated, lacks foundation, is speculative, and constitutes hearsay.  (Defendants' Objections, ¶ 21.)  For reasons already stated throughout this order, the court finds no merit to defendants' objections, and thus overrules them.

on her credit report, she feels stigmatized, has fights with her partner, difficulty sleeping, recurring fear, vomiting, and sick stomach"); *Waddell*, 2006 WL 2640557 at *4 (testimony that "Equifax's failure to provide the requested address information caused [plaintiff] emotional distress severe enough to result in physical symptoms," i.e., "caused her to cry, have her spine tighten up, raise her blood pressure, and have a panic attack," and "negatively affected" relationship with her husband and daughter created a jury question concerning emotional distress damages).[201]

Accordingly, the court denies defendants' motion for summary judgment on the issue of emotional distress damages to the extent such damages are based on Grigoryan's struggle to correct defendants' alleged FCRA and CCRAA violations, and to the extent the damages were suffered on or after November 29 and 30, 2011 and December 3, 2011, the dates on which the only viable FCRA and CCRAA claims Grigoryan has alleged accrued.  The court grants summary judgment in favor of defendants, however, on emotional distress damages arising out of the denial

---

[201]Defendants also appear to assert that Grigoryan cannot recover emotional distress damages because he stated at his deposition that the fact he was unable to have children caused him "[t]he biggest stress."  (Grigoryan Depo. at 201:17-21 ("Have you been, since being diagnosed in – well, even prior to being diagnosed and noticing that you're unable to father a child with your wife, has that you any stress in your life?  A. The biggest stress").)  There are two components to this argument.  Initially, the court agrees that, to the extent Grigoryan claims defendants' caused his infertility, summary judgment in defendants' favor is required, because Grigoryan has not adduced the testimony of any medical expert establishing causation.  See *Pelzer v. Lockformer Co.*, No. CV 01-06485 JBZ, 2005 WL 1651729,*3 (N.D. Ill. July 6, 2005) ("Plaintiff Pepping also fails to offer any expert, medical testimony in support of her claim that her infertility is the result of her exposure to TCE. . . . Like her brother, Pepping cannot withstand Defendant's Motion for Summary Judgment on her claim of infertility due to TCE exposure because she fails to present competent, admissible testimony regarding the proximate cause of her injury.  Summary judgment on her claim is appropriate, and granted.").

Defendants also appear to assert that any emotional distress Grigoryan suffered was caused entirely by his inability to have children, and not by their alleged FCRA and CCRAA violations.  Given the statements in Grigoryan's sworn declaration, a rational trier of fact could conclude that defendants too caused Grigoryan emotional distress.  The court cannot weigh the competing inferences that arise from his declaration and deposition testimony, and conclude as a matter of law that Grigoryan's stress was caused solely by his inability to have children.  Rather, the jury will have to assess the evidence and make an appropriate finding as the trier of fact.

1   or suspension of credit, because Grigoryan proffers no evidence that such credit denials or

2   suspensions, or the emotional distress they caused, were caused by defendants' alleged failure to

3   conduct reasonable reinvestigations under § 1681i and § 1785.16.

4           **3.**      **Whether Grigoryan Has Raised Triable Issues Regarding the Willfulness**

5                     **of Defendants' Conduct**

6        Finally, defendants argue that Grigoryan cannot demonstrate that their failure to conduct

7   reasonable reinvestigations of the BOA HELOC and CMI accounts[202] under § 1681i and § 1785.16

8   were willful.[203]   The FCRA authorizes an award of actual damages or, in lieu thereof, statutory

9   damages of $100 to 1,000 for each willful violation; it also provides for an award of punitive

10  damages. 15 U.S.C. § 1681n(a)(1)(A), (a)(2).   Under the CCRAA, Grigoryan can recover actual

11  damages and punitive damages of not less than $100 and not more than $5,000 per willful

12  violation. CAL. CIV. CODE § 1785.31(a)(2)(A)-(B).     In *Safeco Ins. Co. of Am. v. Burr*, 551

13  U.S. 47, 57 (2007) the Supreme Court held that an FCRA violation is "willful" if it arises from

14  a "reckless disregard" of a consumer's rights under the FCRA.  It stated:

15       "[A] company subject to FCRA does not act in reckless disregard of it unless the

16       action is not only a violation under a reasonable reading of the statute's terms, but

17        shows that the company ran a risk of violating the law substantially greater than the

18        risk associated with a reading that was merely careless." *Id*. at 69.

19       There are no reported decisions addressing willfulness under the CCRAA, but California

20  courts, like federal courts, routinely hold that reckless disregard of the rights or safety of another

21  constitutes willful conduct. See *Dziura v. California Aviation Serv., Inc.*, 4 Cal.App.3d 191, 198

22  (1970) ("To constitute a defense to wilful misconduct, the action of the plaintiff must be as

23  reprehensible as that of defendant, i.e., conduct which shows a wilful or reckless disregard of his

24  _____

25      [202]These are the only accounts as to which Grigoryan has raised triable issues of fact

26  concerning his ability to prove recoverable damages.

27      [203]Because Grigoryan has failed to raise triable issues of fact concerning his ability to prove

damages resulting from Trans Union's reinvestigation of the Sequoia account, the court need not

28  decide whether there are triable issues of fact regarding the willfulness of Trans Union's conduct.

1    own safety"); *Olea v. S. Pac. Co.*, 272 Cal.App.2d 261, 264 (1969) ("Wilful misconduct means

2    intentional wrongful conduct, done either with knowledge that serious injury to (another) probably

3    will result or with a wanton and reckless disregard of the possible results"); cf. *New v. Consol.*

4    *Rock Products Co.*, 171 Cal.App.3d 681, 689-90 (1985) ("Three essential elements must be

5    present to raise a negligent act to the level of wilful misconduct: (1) actual or constructive

6    knowledge of the peril to be apprehended, (2) actual or constructive knowledge that injury is a

7    probable, as opposed to a possible, result of the danger, and (3) conscious  failure to act to avoid

8    the peril."). The court therefore applies *Safeco*'s "reckless disregard" standard to both the FCRA

9    and CCRAA claims.

10           As noted, whether defendants' exclusive reliance on the ACDV process in connection with

11   reinvestigations of the BOA HELOC and CMI account under § 1681i and § 1785.16 was

12   reasonable is an issue of fact that must be decided by the jury.  "If any possible resolution of [this]

13   issue[ ] could support a jury finding that the lack of a reasonable reinvestigation was willful,

14   summary judgment is barred." *Valentine v. First Advantage Saferent, Inc.*, No. CV 08-142 VAP

15   (OPX), 2009 WL 4349694, *12 (C.D. Cal. Nov. 23, 2009).  "Here, [defendants] knowingly and

16   intentionally elected to rely exclusively on automated procedures in attempting to satisfy [their]

17   [§] 1681i obligations.  In light of numerous court decisions finding such automated procedures

18   unreasonable where, as here, a consumer reporting agency was on notice of the possible

19   inaccuracy of the automated responses the creditor would provide, a jury could find that

20   [defendants] did so in reckless disregard of the possibility that [they] would thereby violate of the

21   law." *Saenz*, 621 F.Supp.2d at 1088; *Valentine*, 2009 WL 4349694 at *13 ("Valentine has

22   submitted admissible evidence – his declaration – maintaining he sent his original signature to

23   SafeRent.  Although the latter disputes this, if a fact-finder found in Valentine's favor, and further

24   found that SafeRent was in possession of Valentine's original signature, as he maintains, and that

25   SafeRent nonetheless did not complete a 'reasonable reinvestigation' on these grounds, a

26   reasonable jury could find the lack of a reasonable reinvestigation willful").  See also *Fregoso v.*

27   *Wells Fargo Dealer Services, Inc.*, No. CV 11–10089 SJO (AGRx), 2012 WL 4903291, *10

28   (C.D. Cal. Oct. 16, 2012) ("Plaintiff has provided sufficient evidence in support of his contention

that PCC's disregard of its FCRA violations was willful (i.e. reckless). As described in more detail above, Plaintiff provides evidence demonstrating that PCC, through its employee Ms. Villavicencio, cursorily considered all disputes using a semi-automated process, ignored material distinctions in records, and declined to consider any information beyond that provided in the account summary"); *Bradshaw*, 816 F.Supp.2d at 1076 ("defendants elected to comply with their FCRA obligations by providing general descriptions of plaintiffs' dispute through an automated system.. . . [A] reasonable jury could find that a CRA acted in reckless disregard of its duties by relying exclusively on automated procedures that have been held to be unreasonable by numerous court decisions when the CRA was on notice of the possible inaccuracy of the automated responses").

Defendants disputed this conclusion at the hearing, asserting they were entitled to reach conclusions based on information obtained from "reliable" furnishers. The court cannot agree. A furnisher's reliability, as noted, is relevant in assessing whether a credit reporting agency can rely on information furnished, in the first instance, under § 1681e(b) and § 1785.14(b). As the Third Circuit held in *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997), however, "[t]he 'grave responsibility' imposed by § 1681i(a) must consist of something more than merely parroting information received from other sources." Thus, "a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute." *Id*. Defendants' reliability argument shifts the entire burden of reinvestigation back to the consumer and credit furnisher. Reliability alone is therefore not sufficient to evade a finding of willfulness.

Even were defendants permitted to rely on the reliability of the furnisher to avoid a finding of willfulness, the record lacks any evidence indicating that Sequoia is a "reliable" furnisher of credit; thus, Trans Union's argument concerning Sequoia fails for that reason alone. With respect to the BOA HELOC account, there is no doubt that Bank of America is a well-established bank. Defendants argue that this, coupled with the fact that the bank twice confirmed the accuracy of its reporting through the ACDV process, supports the conclusion as a matter of law that they did not act willfully. Again, the court cannot agree. As noted, whether defendants received payment

receipts from Grigoryan, and failed to forward them to the bank as part of their reinvestigation, is disputed.  If the jury credits Grigoryan's testimony that he attached the receipts to his reinvestigation requests, defendants' failure to forward them to the bank would permit the jury reasonably to conclude that defendants acted in reckless disregard of their § 1681i and § 1785.16 obligations, which require "consider[ation of] all relevant information submitted by the consumer."  See 15 U.S.C. § 1681i(a)(4); see also *Cushman*, 115 F.3d at 225 ("The 'grave responsibility' imposed by § 1681i(a) must consist of something more than merely parroting information received from other sources.  Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute"); *Fregoso*, 2012 WL 4903291 at *10 (concluding that willfulness was a jury question where defendant "cursorily considered all disputes using a semi-automated process, *ignored material distinctions in records*, and declined to consider any information beyond that provided in the account summary" (emphasis added)).

The court therefore denies defendants' motion for summary judgment as to willfulness.  A jury will first have to decide whether their reinvestigations of the BOA HELOC and CMI account were unreasonable, and, if so, whether they were undertaken in "reckless disregard" of Grigoryan's rights under the FCRA and CCRAA.

### III.  CONCLUSION

For the reasons stated, the court grants defendants' motion for summary judgment on Grigoryan's § 1681e(b) and § 1785.14(b) claims.  The court also grants summary judgment in favor of Trans Union on Grigoryan's § 1681i and § 1785.16 claims to the extent they are based on allegations that Trans Union failed reasonably to reinvestigate the Sequoia account.  It denies the motion for summary judgment on Grigoryan's § 1681i and § 1785.16 claims as to all defendants to the extent premised on unreasonable reinvestigation of Grigoryan's BOA HELOC account, and the CMI account.

1       Because business-related damages are not recoverable under the FCRA and CCRAA, and

2  because Grigoryan proffers no evidence that defendants' alleged violations proximately caused any

3  business damages in any event, the court grants summary judgment in defendants' favor on

4  Grigoryan's prayer for damages sustained in connection with his real estate investment business,

5  as well as his purported inability to invest in a Dickies Barbecue franchise.  The court also grants

6  summary judgment in defendants' favor on Grigoryan's prayer for emotional distress damages to

7  the extent such damages are premised on the denial or suspension of credit and/or the

8  corresponding impact on his business because he adduced no evidence of credit denials or

9  suspensions subsequent to November 29 and 30, 2011 and December 3, 2011, the dates on which

10  his viable FCRA and CCRRA claims accrued.  The court denies defendants' motion for summary

11  judgment on Grigoryan's prayer for emotional distress damages arising from his efforts to correct

12  defendants' violations, however.  Finally, the court denies defendants' motion for summary

13  judgment on the issue of the willfulness of their purported § 1681i and § 1785.16 violations.

14

15  DATED: December 18, 2014

16                                        MARGARET M. MORROW
                                        UNITED STATES DISTRICT JUDGE